

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:24-cr-152 |
| | ) | |
| v. | ) | Wire Fraud |
| | ) | 18 U.S.C. §§ 1343 & 2 |
| CHRISTOPHER A. HARRISON, | ) | (Counts 1-4) |
| | ) | |
| *Defendant*. | ) | Mail Fraud |
| | ) | 18 U.S.C. § 1341 & 2 |
| | ) | (Count 5) |
| | ) | |
| | ) | Engaging in Monetary Transactions in |
| | ) | Criminally Derived Property |
| | ) | 18 U.S.C. §§ 1957 & 2 |
| | ) | (Counts 6-8) |
| | ) | |
| | ) | Aggravated Identity Theft |
| | ) | 18 U.S.C. §§ 1028A & 2 |
| | ) | (Counts 9-12) |
| | ) | |
| | ) | Forfeiture Notice |

## INDICTMENT

October 2024 Term - At Richmond, Virginia

THE GRAND JURY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

At all times relevant and material to this Indictment:

1.    The defendant, CHRISTOPHER A. HARRISON (hereafter, "HARRISON"), was a former National Football League player and, after the conclusion of his professional football career, a real estate developer.

1

2. Cedar Rapids Bank & Trust Company ("CRBT"), the Virginia Housing Development Authority ("VHDA"), and Navy Federal Credit Union were financial institutions as defined in 18 U.S.C. § 20.

3. VHDA is a not-for-profit mortgage finance agency created by the Commonwealth of Virginia to help low- and moderate-income Virginians attain quality, affordable housing. VHDA is based in Richmond, Virginia, within the Eastern District of Virginia.

A. **The Model Tobacco Project**

4. The Model Tobacco Project was a fifteen-acre collection of seven buildings in Richmond, Virginia, within the Eastern District of Virginia, centered around the Model Tobacco Building that had previously served as a factory for the United States Tobacco Company. Sometime before October 2020, HARRISON became interested in acquiring the property and converting the buildings into an apartment complex.

5. HARRISON owned, operated, and managed various corporate entities related to his real estate development work with the Model Tobacco Project: C.A. Harrison Companies, LLC ("CAHC"), CAH Model Tobacco, LLC, and McKenzie Blake Development Company, LLC ("MBDC").

6. For MBDC, HARRISON opened, maintained, and controlled a bank account at Navy Federal Credit Union ending in 2291 ("MBDC Bank Account").

7. In or about October 2020, HARRISON sought to obtain a bridge loan from CRBT for approximately $14,492,057, which funds were to be applied towards the development and construction of the Model Tobacco Project. On or about October 27, 2020, HARRISON executed a loan agreement with CRBT, signing the agreement as the Manager of MBDC. This loan agreement set forth, in relevant part:

Borrower shall use Loan Proceeds solely to pay costs and expenses shown on the Sworn Construction Cost Statement and incurred by Borrower in connection with the rehabilitation of the Improvement and equipping of the Improvements, together with other expenses set forth on the Sworn Construction Cost Statement and such incidental costs and expenses relating thereto as may be approved from time to time in writing by Lender. No proceeds of the Loan may be used to pay any construction, management, development or contractor's fees to Borrower, Manager, Pledgors, Master Tenant, Master Tenant Managing Member, Guarantor or any Affiliate.

8.      As a Borrower, Manager, and Guarantor, HARRISON was prohibited from using the loan proceeds to pay himself or any "Affiliate" – which term was defined in the loan agreement as "any entity controlled by or under common control with Borrower or with any Guarantor" – any construction, management, development, or contractor's fees.  HARRISON was further prohibited by the plain terms of the loan agreement from using the loan proceeds for his personal expenditures and/or applying such funds outside the Model Tobacco Project.

9.      On or about October 27, 2020, as part of receiving the bridge loan, HARRISON entered into a separate disbursing agreement with CRBT, which set forth that in advance of CRBT's disbursement of loan proceeds, the Borrower (*i.e.*, HARRISON) was required to submit a signed draw request to CRBT with evidence that HARRISON had satisfied conditions of disbursement.  One condition of disbursement was that HARRISON had to submit: (1) statements of costs paid to contractors; and (2) evidence that such contractors waived liens arising from the work done on the Model Tobacco Project.

10.      On numerous occasions, as a condition of disbursing money to HARRISON, CRBT requested HARRISON provide proof that contractors working on the development and construction of the Model Tobacco Project had waived any liens on the project for unpaid fees.

**B.      The Whitaker Park Project**

11.      The Whitaker Park Project was a redevelopment of the R.J. Reynolds tobacco manufacturing building in Winston Salem, North Carolina. Sometime before May of 2021,

3

HARRISON became interested in acquiring the property and converting it into loft-style apartment homes.

12.     HARRISON owned, operated, and managed various additional corporate entities related to his real estate development work with the Whitaker Park Project, including Cavalier Winston Development, LLC ("CWDL").

13.     In or about May 2021, HARRISON sought to obtain a bridge loan from CRBT for approximately $7,706,675, to be applied towards the development and construction of the Whitaker Park Project. On or about May 24, 2021, HARRISON executed a loan agreement with CRBT, signing the agreement as the Manager of CWDL.

14.     Certain provisions of this loan agreement were similar or identical to provisions of the bridge loan agreement HARRISON executed with CRBT for the Model Tobacco Project. For instance, under the terms of this agreement, HARRISON was prohibited from using loan proceeds to pay himself or an affiliate any construction, management, development, or contractor's fees. HARRISON was further prohibited by the plain terms of the loan agreement from using the loan proceeds for his personal expenditures and/or applying such funds for any purpose other than the Whitaker Park Project

15.     On or about May 24, 2021, as a necessary part of receiving the bridge loan, HARRISON entered into a separate disbursing agreement with CRBT which set forth that in advance of disbursement of loan proceeds, the Borrower (*i.e.*, HARRISON) was required to submit a signed draw request to CRBT with evidence that HARRISON had satisfied conditions of disbursement. One condition of disbursement was that HARRISON had to submit: (1) statements of costs paid to contractors; and (2) evidence that such contractors waived liens arising from the work done on the Whitaker Park Project.

4

16.     On numerous occasions, as a condition of disbursing money to HARRISON, CRBT requested HARRISON provide proof that contractors working on the development and construction of the Whitaker Park Project had waived any liens on the project for unpaid fees.

## SCHEME AND ARTIFICE TO DEFRAUD

17.     The allegations contained in the preceding paragraphs are realleged and incorporated as if fully set forth herein.

18.     From on or about at least October 21, 2020, to at least on or about February 24, 2023, the exact dates being unknown, in the Eastern District of Virginia and elsewhere, CHRISTOPHER A. HARRISON, the defendant herein, devised and intended to devise a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises.

### *Purpose and Object of the Scheme*

19.     The primary purpose and object of HARRISON's scheme was to unjustly enrich himself by misappropriating loan proceeds intended for the development and construction of the Model Tobacco and Whitaker Park Projects ("Projects") through various means.

### *Manner and Means of the Scheme*

20.     The various ways and means through which HARRISON sought to accomplish the purpose of his scheme to defraud included, but were not limited to, the following.

### A.     Model Tobacco Project Closing Draw

21.     On or about October 21, 2020, in anticipation of closing on the bridge loan with CRBT, HARRISON, together with Co-Conspirator-1 ("CC-1"), prepared a falsified invoice purporting to show that an entity named "Virginia Demolition dba Lewis Brothers Construction" had invoiced HARRISON $206,907 for demolition services. The address and phone number listed

on the invoice were associated with a legitimate demolition company named Lewis Brothers Inc. (hereafter, "Lewis Brothers"), based in the Eastern District of Virginia and owned by S.L.  In truth, however, no representative of Lewis Brothers had prepared this invoice or had invoiced HARRISON for $206,907.  Further, Lewis Brothers had no affiliation with any entity named "Virginia Demolition."

22.    Thereafter, on or about October 23, 2020, in anticipation of closing on the bridge loan with CRBT, HARRISON prepared a fraudulent lien waiver document, purportedly showing that "Virginia Demolition dba Lewis Brothers Inc." had waived and released any lien pertaining to the Model Tobacco Project through October 23, 2020.  The lien release falsely depicted that "Virginia Demolition" was paid $212,306 and that the President of Virginia Demolition was S.L.  In truth, HARRISON had forged and caused to be forged the signature of S.L. on this document, and S.L. had no affiliation with Virginia Demolition.

23.    On or about October 24, 2020, HARRISON submitted and caused to be submitted the fraudulent invoice and lien waiver to VHDA in anticipation of receiving the "closing draw" – *i.e.*, the initial disbursement of loan proceeds from CRBT at the time of closing.  At the time, Harrison was in the process of finalizing a construction loan with VHDA in the approximate amount of $34,700,000 for the construction and development of the Model Tobacco Project.  On or about October 24, 2020, HARRISON submitted and caused to be submitted the fraudulent lien waiver to CRBT.  As part of the bridge loan closing for the Model Tobacco Project, HARRISON claimed approximately $212,306 had been paid to Virginia Demolition to date, seeking to have these amounts recompensed by CRBT's closing draw.

24.    On or about October 25, 2020, a broker facilitating the development of the Model Tobacco project requested clarification on behalf of VHDA on the difference between the

6

$212,306 amount on the lien waiver and HARRISON's claimed payments to Virginia Demolition and the $206,907 amount listed on the Virginia Demolition invoice. In response, on or about October 26, 2020, CC-1 and HARRISON prepared a fictitious change order in the amount of $6,000 purporting to show additional work performed by "Virginia Demo dba Lewis Brothers, Inc."

25.    On or about October 26, 2020, HARRISON retained and instructed K.M., a tax return preparer, to create Virginia Demolition LLC (hereafter, "Virginia Demolition") for HARRISON and to register the company in the Commonwealth of Virginia with the State Corporation Commission. The Articles of Organization for Virginia Demolition listed the entity's principal office and headquarters as the business address for HARRISON's other company, CAHC, in Bethesda, Maryland. At no time did Virginia Demolition have any employees, demolition equipment, office space, or assets.

26.    On or about October 27, 2020, HARRISON opened a business checking account for Virginia Demolition at Navy Federal Credit Union (account ending in 3370). On the paperwork to open this application, HARRISON listed the physical address of Virginia Demolition as being in Bethesda, Maryland – providing the same address utilized by HARRISON's other business, CAHC – and listed the mailing address of Virginia Demolition as the Glen Allen, Virginia address of HARRISON's family friends, A.H. and T.H. HARRISON further listed himself as the sole employee and owner of Virginia Demolition and claimed that the business' current or estimated annual sales/revenue is or would be $1,000,000. On the paperwork, HARRISON requested that Navy Federal Credit Union issue a debit card to him for Virginia Demolition. HARRISON was the only signatory on the account.

7

27.     HARRISON was the sole owner, operator, and member of Virginia Demolition. Under the terms of the bridge loan agreement with CRBT, Virginia Demolition was an "Affiliate" company of HARRISON's and thus precluded—as HARRISON well knew—from receiving bridge loan proceeds.

28.     As a result of HARRISON's false submittals, and upon HARRISON signing the bridge loan agreement and disbursing agreement with CRBT, HARRISON obtained approximately $212,306 for Virginia Demolition from CRBT on or about October 28, 2020.

29.     Thereafter, HARRISON repeatedly prepared and submitted false and misleading invoices, in addition to fabricated documents that falsely purported to corroborate those invoices, to CRBT for the Model Tobacco Project to induce CRBT to disburse loan proceeds for the satisfaction of those (fictitious) expenditures.  HARRISON utilized some of these loan proceeds for his own benefit, rather than applying them to the Model Tobacco Project as the loan terms required.  HARRISON misappropriated certain loan proceeds intended for the development and construction of the Model Tobacco Project through these falsified and misleading invoices. HARRISON prepared and submitted certain falsified and misleading invoices within each and every loan draw request submitted to CRBT for the Model Tobacco Project.

**B.      Model Tobacco Project Third Loan Draw**

30.     As an illustrative example of HARRISON's false submittals to CRBT for the Model Tobacco Project, HARRISON prepared a falsified invoice for his alter ego company, Virginia Demolition, on or about February 1, 2021.  In order to conceal HARRISON's affiliation with and ownership of Virginia Demolition, the invoice falsely listed S.L.'s business address in the Eastern District of Virginia as the address for Virginia Demolition and the phone number of T.H. (HARRISON's family friend) as the phone number for Virginia Demolition. The invoice was

8

dated January 25, 2021, and was for "Demolition- Change Order" in the approximate amount of $83,000.

31.     Thereafter, HARRISON prepared a fraudulent lien waiver document, purportedly showing that Virginia Demolition waived and released any lien pertaining to the Model Tobacco Project through January 25, 2021. The lien release falsely depicted that the President of Virginia Demolition was S.L. In truth, HARRISON forged and caused to be forged the signature of S.L. on this document, and S.L. had no affiliation with Virginia Demolition.

32.     HARRISON generated additional falsified invoices and lien releases in the name of one other company as part of this draw.

        a.  In or about January 22, 2021, a construction company named Dickens Construction, based in the Eastern District of Virginia, submitted to HARRISON via e-mail two invoices in the approximate amounts of $27,152 and $1,225, seeking payment for excavation work performed on the Model Tobacco Project. Using Dickens Construction's submitted invoice as a template, HARRISON doctored the invoice to falsely reflect that HARRISON owed $95,200 to Dickens Construction.

        b.  On or about January 30, 2021, HARRISON prepared a template lien release and e-mailed it to a representative of Dickens Construction, requesting signature. The template HARRISON provided to Dickens Construction reflected that the amount owed to Dickens Construction was $35,477 and specified that Dickens Construction would waive any liens in the Model Tobacco Project in connection with their work. On or about February 1, 2021, a representative of Dickens Construction signed the document that

9

HARRISON prepared, including obtaining a notarization on the signature page. On February 1, 2021, HARRISON thereafter asked Dickens Construction to overnight mail the lien release to HARRISON's address. Thereafter, HARRISON chopped off the notarization signature page of Dickens Construction's submittal, appending it to a doctored lien waiver that listed a contract amount of $95,200 (the same inflated amount HARRISON listed on the doctored invoice).

33.    On or about February 1, 2021, HARRISON submitted and caused to be submitted the fraudulent invoices and lien waivers for Virginia Demolition and Dickens Construction to CRBT in anticipation of receiving the third draw disbursement of the bridge loan.

34.    As a result of HARRISON's false submittals to CRBT, HARRISON obtained a third draw from the Model Tobacco Project bridge loan in the approximate amount of $1,338,564, which included approximately $95,200 for Dickens Construction and approximately $191,565.64 for Virginia Demolition, on or about February 3, 2021.

### C. Whitaker Park Project Loan Draws

35.    Mirroring his conduct on the Model Tobacco Project, HARRISON on several occasions falsified documents and submitted them to CRBT to induce CRBT to unwittingly disburse loan proceeds to HARRISON's alter ego company, Virginia Demolition, to satisfy purported construction expenses for the Whitaker Park Project. HARRISON utilized some of these loan proceeds for his own benefit, rather than applying them to the Whitaker Park Project as the loan terms required. HARRISON prepared and submitted certain falsified and inflated invoices in multiple loan draw requests to CRBT for the Whitaker Park Project.

36.    As an illustrative example of HARRISON's false submittals to CRBT for the Whitaker Park Project, HARRISON prepared a falsified invoice for his alter ego company, Virginia Demolition.  To conceal HARRISON's affiliation with and ownership of Virginia Demolition, the invoice falsely listed S.L.'s business address in the Eastern District of Virginia as the address for Virginia Demolition and the phone number of T.H. (HARRISON's family friend) as the phone number for Virginia Demolition. The invoice was dated June 21, 2021, and was purportedly for a "Demolition-Change Order" in the approximate amount of $599,672.

37.    Thereafter, HARRISON prepared a fraudulent lien waiver document, purportedly showing that "Virginia Demolition" waived and released any lien pertaining to the Model Tobacco Project through June 28, 2021. The lien release further falsely depicted that Virginia Demolition had been paid approximately $599,672. The lien release also falsely depicted that the President of Virginia Demolition was S.L. In truth, HARRISON forged and caused to be forged the signature of S.L. on this document, and S.L. had no affiliation with Virginia Demolition.

38.    On or about July 6, 2021, HARRISON submitted and caused to be submitted the fraudulent invoice and lien waiver to CRBT in anticipation of receiving the first draw disbursement of the bridge loan for the Whitaker Park Project.

39.    As a result of HARRISON's false submittals to CRBT, HARRISON obtained a first draw from the CRBT loan in the approximate amount of $2,311,668, which included approximately $599,672 for Virginia Demolition's purported expenses, on or about July 6, 2021.

### D. False Statements to VHDA for the Model Tobacco Project

40.    On or about October 27, 2020, HARRISON and VHDA finalized a construction loan in the approximate amount of $34,700,000 for the construction and development of the Model Tobacco Project.  As part of this lending agreement and relationship, HARRISON was required to

provide VHDA with the draw packets – including invoices and lien waivers – he submitted to CRBT for each construction draw. Further, HARRISON was required to provide VHDA with proof showing that HARRISON had paid the invoices in question with the bridge loan proceeds he received from CRBT. Starting in or around November 2020 and continuing through at least in or around May 2021, HARRISON submitted the invoices and lien releases he falsified and previously submitted to CRBT to VHDA (including falsified documents in the name of Virginia Demolition and Dickens Construction).

41.    For instance, to conceal that he had submitted a fraudulent and inflated invoice for Dickens Construction in the approximate of $95,200 to CRBT as part of a loan draw request for the Model Tobacco Project, HARRISON took out a cashier's check in the approximate amount of $95,200 on or about February 8, 2021 addressed to Dickens Construction. On or about April 12, 2021, HARRISON submitted an image of this check to VHDA, purporting that Dickens Construction had been paid this amount. However, HARRISON did not pay Dickens Construction this $95,200. Rather, on or about the same day HARRISON took out this cashier's check, after he scanned the check for submittal to VHDA, HARRISON redeposited the check into his own account.

42.    As another illustrative example, to conceal that he had submitted a fraudulent and inflated invoice for Dickens Construction in the approximate amount of $119,860 to CRBT as part of a loan draw request for the Model Tobacco Project, HARRISON took out a cashier's check in the approximate amount of $119,860 on or about April 9, 2021, addressed to Dickens Construction. On or about May 3, 2021, HARRISON submitted an image of this check to VHDA, purporting that Dickens Construction had been paid this amount. However, HARRISON did not pay Dickens Construction this $119,860. Rather, on or about the same day HARRISON took out

12

this cashier's check, after he scanned the check for submittal to VHDA, HARRISON redeposited it into his own account.

**E.**     **HARRISON's Efforts to Conceal his Ownership of Virginia Demolition**

43.    During his lending relationship with CRBT, HARRISON never disclosed his ownership and affiliation with Virginia Demolition; rather, HARRISON created a false and misleading impression that Virginia Demolition was owned and operated by a third party.

44.    For instance, on or about February 3, 2021, a representative of CRBT sought clarification as to certain supporting documentation believed to be missing from a loan draw request submittal for the Model Tobacco Project. The same day, HARRISON responded via email, "Please look at the Virginia Demolition lien releases, it covers there [*sic*] pay application and the $83K change order they submitted. . ."

45.    To further distance himself from and obfuscate his true relationship with Virginia Demolition, HARRISON utilized the phone number of T.H., a family friend, as Virginia Demolition's purported phone number without T.H.'s knowledge or consent, he utilized S.L.'s business address as Virginia Demolition's purported address without S.L.'s knowledge or consent, and he falsely represented S.L. to be the president of Virginia Demolition without S.L.'s knowledge or consent.

* * *

46.    In total, HARRISON prepared and submitted eight fraudulent invoices and lien waivers to Safe Harbor Title Company, CRBT and/or VHDA in relation to the Model Tobacco Project and five fraudulent invoices and lien waivers to CRBT in relation to the Whitaker Park Project. Through these false submissions, HARRISON fraudulently induced CRBT to distribute at least $3,665,154.42 in loan proceeds to him.

13

## COUNTS ONE THROUGH FOUR
(Wire Fraud)

47.     The allegations contained in paragraphs 1 through 46 of this Indictment, including

subparagraphs, are realleged and incorporated as if fully set forth herein.

48.     On or about the dates set forth below, in the Eastern District of Virginia and

elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and

for obtaining money and property by means of materially false and fraudulent pretenses,

representations, and promises affecting a financial institution, and attempting to do so, defendant

CHRISTOPHER A. HARRISON, aided, abetted, counseled, and encouraged by others, both

known and unknown to the Grand Jury, knowingly caused to be transmitted by means of wire

communication in interstate commerce, the writings, signs, signals, pictures, and sounds described

below:

| Count | Date of Wire Transmission (on or about) | Description of Wire Transmission |
|-------|------------------------------------------|----------------------------------|
| 1 | January 5, 2021 | As a result of HARRISON generating a fabricated invoice in the name of Virginia Demolition and forging the signature of S.L. on a lien waiver in the name of Virginia Demolition, and because HARRISON submitted these fraudulent documents to Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa in connection with the Model Tobacco Project, HARRISON obtained a second draw of approximately $696,217 of loaned funds, which included approximately $340,403.65 for Virginia Demolition. Specifically, on or about January 5, 2021, CRBT disbursed approximately $696,217 in loan proceeds to Harrison's MBDC Bank Account at Navy Federal Credit Union ending in 2291 (with servers in the Eastern District of Virginia), causing an interstate wire transmission to be initiated from outside of Virginia into the Eastern District of Virginia. |
| 2 | February 3, 2021 | As a result of HARRISON generating fabricated invoices in the name of Virginia Demolition and Dickens Construction and forging the signature of S.L. on a lien waiver in the name of Virginia Demolition, and because HARRISON submitted these |

14

| | | fraudulent documents to Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa in connection with the Model Tobacco Project, HARRISON obtained a third draw of approximately $1,338,564 of loaned funds, which included approximately $191,565.64 for Virginia Demolition and approximately $95,200 for Dickens Construction. Specifically, on or about February 3, 2021, CRBT disbursed approximately $1,338,564 in loan proceeds to Harrison's MBDC Bank Account at Navy Federal Credit Union ending in 2291 (with servers in the Eastern District of Virginia), causing an interstate wire transmission to be initiated from outside of Virginia into the Eastern District of Virginia. |
|---|---|---|
| 3 | April 7, 2021 | As a result of HARRISON generating fabricated invoices in the name of Virginia Demolition and Dickens Construction and forging the signature of S.L. on a lien waiver in the name of Virginia Demolition, and because HARRISON submitted these fraudulent documents to Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa in connection with the Model Tobacco Project, HARRISON obtained a fifth draw of approximately $2,247,824.71 of loaned funds, which included approximately $201,613.33 for Virginia Demolition and approximately $119,860 for Dickens Construction. Specifically, on or about April 7, 2021, CRBT disbursed approximately $2,247,824.71 in loan proceeds to Harrison's MBDC Bank Account at Navy Federal Credit Union ending in 2291 (with servers in the Eastern District of Virginia), causing an interstate wire transmission to be initiated from outside of Virginia into the Eastern District of Virginia. |
| 4 | July 6, 2021 | As a result of HARRISON generating a fabricated invoice in the name of Virginia Demolition and forging the signature of S.L. on a lien waiver in the name of Virginia Demolition, and because HARRISON submitted these fraudulent documents to Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa in connection with the Whitaker Park Project, HARRISON obtained a first draw of approximately $2,311,688.93 of loaned funds, which included approximately $599,672 for Virginia Demolition. Specifically, on or about July 6, 2021, CRBT disbursed approximately $2,311,688.93 in loan proceeds to Harrison's MBDC Bank Account at Navy Federal Credit Union ending in 2291 (with servers in the Eastern District of Virginia), causing an interstate wire transmission to be initiated from outside of Virginia into the Eastern District of Virginia. |

(In violation of Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
(Mail Fraud)

49.     The allegations contained in paragraphs 1 through 46 of this Indictment are realleged and incorporated as if fully set forth herein.

50.     On or about the date set forth below, in the Eastern District of Virginia and elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises affecting a financial institution, and attempting to do so, defendant CHRISTOPHER A. HARRISON, aided, abetted, counseled, and encouraged by others, both known and unknown to the Grand Jury, knowingly caused to be delivered by mail, or by any private or commercial interstate carrier, according to the direction thereon, the following mail matter:

| Count | Date of Mailing (on or about) | Description of Mailing |
|-------|-------------------------------|------------------------|
| 5 | October 28, 2020 | A mailing containing a business debit card for Virginia Demolition's Navy Federal Credit Union bank account ending in 3370 that was mailed by a representative of Navy Federal Credit Union, who submitted that mailing to the United States Postal Service on or about October 28, 2020, in order for the United States Postal Service to deliver the mailing to an address in the Eastern District of Virginia, specifically, the residence of T.H., as designated by HARRISON. |

(In violation of Title 18, United States Code, Sections 1341 and 2.)

16

## COUNTS SIX THROUGH EIGHT
(Engaging in Monetary Transactions in Criminally Derived Property)

51.     The allegations contained in paragraphs 1 through 46 of this Indictment are realleged and incorporated as if fully set forth herein.

52.     After receiving disbursements of fraudulent loan proceeds from CRBT, HARRISON spent some of these funds on personal expenses and not on the development and construction of the Projects. Specifically, HARRISON made the following personal purchases with monies he misappropriated from the Projects, among others:

a.  On or about January 11, 2021, HARRISON made a mortgage payment of approximately $12,495.68 to PNC Bank for his personal residence.

b.  On or about January 12, 2021, HARRISON paid $10,000 to Lenkersdorfer Fine Jewelers in McLean, Virginia, within the Eastern District of Virginia, for a down payment on a Rolex watch.

c.  On or about January 15, 2021, HARRISON made a $1,054 purchase at Christian Louboutin, a luxury fashion store.

d.  On or about January 21, 2021, HARRISON paid $3,000 to John Shorb Landscaping Inc. for landscaping services at his home address in the District of Columbia.

e.  On or about July 9, 2021, HARRISON used fraud proceeds to pay a law firm $9,607 in legal fees for HARRISON's litigation against the City of Petersburg in relation to the Petersburg Ramada Inn. [1]

---

[1] The Petersburg Ramada Inn was a shuttered building and former hotel in Petersburg, Virginia. HARRISON purchased the property in or around 2018 and sold it back to the City of Petersburg in June 2022.

      f.  On or about April 23, 2021, HARRISON paid $4,000 for tuition and tutoring of his minor aged child.

53.    On or about the following dates and in the manner described below, in the Eastern District of Virginia and elsewhere, defendant CHRISTOPHER A. HARRISON, aided, abetted, counseled, and encouraged by others, known and unknown, did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits representing fraudulently obtained loan proceeds, such property having been derived from a specified unlawful activity, that is Wire Fraud, in violation of Title 18, United States Code, Section 1343.

| Count | On or About Date | Monetary Transaction |
|-------|------------------|----------------------|
| 6 | January 27, 2021 | HARRISON made a $22,400 payment to Lenkersdorfer Fine Jewelers, a store based in McLean, Virginia, within the Eastern District of Virginia, to purchase a Rolex watch. HARRISON made this payment from his personal Navy Federal Credit Union Account ending in 2288. Such funds constituted fraudulently obtained loan proceeds from Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa, derived from the specified unlawful activity outlined in Paragraphs 1 through 46 of the Indictment (Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2). |
| 7 | March 8, 2021 | HARRISON made a $15,000 payment to Lenkersdorfer Fine Jewelers, a store based in McLean, Virginia, within the Eastern District of Virginia, to purchase a Rolex watch. HARRISON made this payment from his personal Navy Federal Credit Union Account ending in 2288. Such funds constituted fraudulently obtained loan proceeds from Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa, derived from the specified unlawful activity outlined in Paragraphs 1 through 46 of the Indictment (Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2). |
| 8 | April 9, 2021 | HARRISON made a $14,336 payment to Lenkersdorfer Fine Jewelers, a store based in McLean, Virginia, within the Eastern District of Virginia, to purchase a Rolex watch. HARRISON made this payment from his personal Navy Federal Credit Union Account ending in 2288. Such funds constituted fraudulently obtained loan proceeds from Cedar Rapids Bank & Trust Company in Cedar Rapids, Iowa, derived from the specified unlawful activity outlined in Paragraphs 1 through 46 of the Indictment (Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2). |

(In violation of Title 18, United States Code, Sections 1957 & 2.)

19

## COUNTS NINE THROUGH TWELVE
(Aggravated Identity Theft)

54.     The allegations contained in paragraphs 1 through 48 of this Indictment are realleged and incorporated as if fully set forth herein.

55.     On or about the dates and in the manner set forth below, in the Eastern District of Virginia and elsewhere, CHRISTOPHER A. HARRISON, aided, abetted, counseled, and encouraged by others both known and unknown to the Grand Jury, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit: wire fraud, in violation of 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person:

| Count | Date (On or About) | Means of Identification | Description of Transaction | Felony Violation |
|-------|--------------------|--------------------------|----------------------------|------------------|
| 9 | January 5, 2021 | S.L.'s name and forged signature | HARRISON's submission of a fraudulent lien waiver in the name of Virginia Demolition to CRBT for the Model Tobacco Project, containing S.L.'s name and forged signature. | 18 U.S.C. § 1343 (Count 1) |
| 10 | February 3, 2021 | S.L.'s name and forged signature | HARRISON's submission of a fraudulent lien waiver in the name of Virginia Demolition to CRBT for the Model Tobacco Project, containing S.L.'s name and forged signature. | 18 U.S.C. § 1343 (Count 2) |
| 11 | April 7, 2021 | S.L.'s name and forged signature | HARRISON's submission of a fraudulent lien waiver in the name of Virginia Demolition to CRBT for the Model Tobacco Project, containing S.L.'s name and forged signature. | 18 U.S.C. § 1343 (Count 3) |
| 12 | July 6, 2021 | S.L.'s name and forged signature | HARRISON's submission of a fraudulent lien waiver in the name of Virginia Demolition to CRBT for the Whitaker Park Project, containing S.L.'s name and forged signature. | 18 U.S.C. § 1343 (Count 4) |

(In violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.)

## **FORFEITURE ALLEGATION**

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, the defendant is hereby notified that upon conviction of any of the offenses charged in Counts One through Four of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from any proceeds traceable to the offense.

The defendant is further notified that upon conviction of the offense charged in Count Five of this Indictment, the defendant shall forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

The defendant is further notified that upon conviction of any of the offenses charged in Counts Six through Eight of this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property. Property subject to forfeiture includes, but is not limited to:

> A sum of money of at least $3,665,154.42, which represents the amount of proceeds the defendant obtained from the offenses of conviction, which sum shall be reduced to a monetary judgment against the defendant in favor of the United States.

If the property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Sections 982(a)(1), 982(a)(2) and 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461 and Title 21, United States Code, Section 853(p).)


JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
      Kashan K. Pathan
      Avi Panth
      Assistant United States Attorneys

A TRUE BILL:

_____
FOREPERSON                    10/15/2024

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

21