IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

**Richmond Division**


UNITED STATES OF AMERICA      )
                          )

v.                             )
                          )

CHRISTOPHER A. HARRISON      ) Case No.: 3:24-CR-152-DJN
                          )

*Defendant*.                 )
                          )


### DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO SENTENCING MEMORANDUM

It is undisputed that Chris Harrison is talented, generous, and hardworking. It is undisputed that he applied those characteristics, as well as millions of dollars of his own money, to the job of turning the old Model Tobacco factory into a successful apartment development in a neighborhood that needed it. And it is undisputed that Mr. Harrison inflated certain invoices to fraudulently receive $159,202.77 from Cedar Rapids Bank & Trust (CRBT), and also violated his terms of pre-trial release. Mr. Harrison takes full responsibility for this conduct. *See* Ex. 31 (Mr. Harrison's Letter to the Court).

It is also undisputed that civil litigation and disagreements between partners led to an initial $49 million offer for the property expiring, and the project entering bankruptcy. Ex. 37 at 3. It is undisputed that Model Tobacco is a valuable property, with assets capable of satisfying an outstanding balance owed to CRBT, and satisfying a $6.7 million judgment in favor of two partners that will almost double those partners' original investment. And it is undisputed that an investor in Whitaker Park rejects the government's characterization of him as a "victim," and along with other real estate professionals, believes Mr. Harrison ensured these projects "avoided

the loss of valuable tax credits" by managing the demolition himself.  Ex. 32 at 2-3 (Mr. Andy Little's Supp. Statement).

What *is disputed* is how to apply the Sentencing Guidelines and what would be a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).  Regarding the Guidelines, the Defense agrees with the Probation Office's calculation except for the calculation of Loss Amount.  The Government, on the other hand, disagrees with the Probation Office's determinations, and seeks a sentence that is double the range determined by the Probation Officer, and wildly disparate from the sentences similarly-situated defendants have received.

We will first discuss the question of whether the victim of Mr. Harrison's conduct is CRBT or the other project investors. We agree with the Probation Office that the victim here is CRBT, not the investors. As a result, the correct loss amount is zero dollars. However, even if the victim is determined to be the investors, the correct loss amount remains zero. This is because the services Mr. Harrison openly provided to the other investors far exceeded any losses to the project from his conduct.

Seven main points support this proposition.  First, CRBT was repeatedly informed that Mr. Harrison was doing demolition work.  Second, the government has misunderstood the evidence regarding Mr. Harrison's involvement in Virginia Demolition.  Third, the other agreements in this case support the fact that Mr. Harrison was authorized to perform demolition services on the project.  Fourth, Mr. Harrison added significant value to the Model Tobacco and Whitaker Park Projects by overseeing and coordinating demolition personally.  Fifth, Mr. Harrison put the money gained from Virginia Demolition back into the Model Tobacco project. Sixth, the government's conception of fair market value ignores the Sentencing Guidelines, and

2

its use of the *United States v. Butler* case is inapt because the fact patterns are not sufficiently analogous to the present case. And finally, the ongoing bankruptcy proceedings are likely to minimize any harm to other investors.

### THE CORRECT LOSS AMOUNT UNDER THE GUIDELINES IS ZERO DOLLARS

Throughout this briefing, both the Defense and the Government have offered varying formulations of how to calculate the appropriate loss amount attributable to Mr. Harrison, and how to define who were victims of Mr. Harrison's offense. Regardless of which formulation the Court uses, however, the correct loss amount is zero dollars.

**Cedar Rapids Bank & Trust:** The Defense agrees with the Probation Office that the victim is CRBT, "since CRBT paid the inflated invoices." PSR (ECF No. 48) at 33. For Whitaker Park, it is undisputed that CRBT's bridge loan was fully repaid, so there are zero losses to CRBT from that project.[1] For the Model Tobacco Project, while the government alleges that CRBT loaned $1,087,839.52 in proceeds because of Mr. Harrison's conduct, the Sentencing Guidelines expressly provide that a lender's "loss" is to be offset by the fair market value of any collateral. *See* U.S.S.G. § 2B1.1 cmt. 3(D)(ii, iii). That collateral is more than enough to offset any loss to CRBT in two ways. There is a dedicated amount "currently held by SPE PNC Model Tobacco Master Tenant, LLC," which should cover any remaining amounts owed to CRBT for Model Tobacco. *See* Ex. 30 at Part 11, Line 77 (listing $5,374,664 as the amount). And there appears to be ample equity in Model Tobacco to pay CRBT. Thus, when looking at this case from the perspective of CRBT, the actual loss is zero dollars.

---

[1] The government's loss calculation for Whitaker Park is flawed for another reason. The Government has only alleged that one invoice for Whitaker Park was problematic — a June 21, 2021 invoice for $599,672 — submitted on July 6, 2021. Nevertheless, the Government claims that Mr. Harrison received approximately $1.7 million in revenue on account of allegedly fraudulent draw requests. That math does not work. Even under the government's theory, the remaining revenue must have come from other sources and could not be the result of alleged fraud.

**Other Investors:** Even if one were to move beyond the Probation Office's determination of the victim, and instead consider Mr. Harrison's fellow investors as the "victims" for purposes of calculating loss amount, the final amount calculated would still be zero. For Whitaker Park, which had only three investors (including Mr. Harrison), there are no victims. Andy Little, one of the investors in the property, does not consider himself to be a victim and has written a supplemental statement rejecting the government's characterization of Virginia Demolition as a fraudulent scheme. Ex. 32 at 2. And the other investor, Bart Frye, bought out Mr. Harrison's interests with full knowledge that Mr. Harrison did demolition work on the property through Virginia Demolition. Furthermore, any loss amount caused by Mr. Harrison's conduct to the investors of Whitaker Park would necessarily need to be reduced by at least 33%, to reflect Mr. Harrison's ownership interests at the time of his conduct, since Mr. Harrison could not unlawfully take proceeds from himself.

For Model Tobacco, any loss amount ascribed to the entire investor group would first need to be reduced by the equity ownership that Mr. Harrison had as an investor (conservatively estimated to be at least 14.75%), since Mr. Harrison could not improperly take funds from himself. Second, it must be offset by any money returned by Mr. Harrison to the Model Tobacco project and its investors. U.S.S.G. § 2B1.1 cmt. 3(D)(i). When Mr. Harrison used personal funds to pay expenses incurred by the Model Tobacco project after closing, he returned money to the Model Tobacco project and its investors. Thus, the loss amount claimed by the government must be reduced by the $4.3 million that Mr. Harrison returned to the project.[2] Finally, any loss amount (or improper gain by Mr. Harrison) on *both* projects would need to be reduced by the "money

---

[2] Even if the government accounted for any potential funds provided by other investors in CAH Model Tobacco, such as K.R., Mr. Harrison's additional contribution would still exceed the loss amount alleged by the government in this case.

returned and the fair market value of…services rendered by the defendant…to the victim before

the offense was detected." U.S.S.G § 2B1.1 cmt. 3(D)(i).  This includes the "fair market value" of

demolition services that Mr. Harrison provided to the project.  After accounting for these factors,

the loss amount is zero dollars.

## MR. HARRISON OPENLY PROVIDED VALUABLE DEMOLITION SERVICES

**I.      The Government Concedes that CRBT Knew Harrison Was Doing Demolition Work**

The government initially claimed that Mr. Harrison concealed his affiliation with Virginia

Demolition, because CRBT's Bridge Loan Agreement did not allow loan proceeds to be paid to

Mr. Harrison or his affiliates for demolition work done on the projects.  Govt. Op. Br. at 16.  But

the defense showed that both CRBT and its consultant, Moran, were explicitly notified through

emails that Mr. Harrison was doing demolition work on Model Tobacco.  Defendant's Ex. 12 at 2,

5.

> Attached are the invoices for a demo draw that will be included on the Settlement Statement for the upcoming Model Tobacco closing.  As you know - Chris has been working on Demo in advance of the M▮ T▮ Construction contract.

> Due to the various COVID delays - Chris' group acquired the Model Tobacco building over the summer and they've actually started demo and abatement (outside of Mark Turner's GC contract with VHDA).
>
> Chris would like to make a construction draw of $300/$400k out of closing to pay for the outstanding invoice related to the work.

These emails made clear that both CRBT and Moran knew Mr. Harrison was "working on Demo"

and more importantly, that Mr. Harrison expected to be compensated for it.  *See* Defendant's Ex.

12 at 5 (noting that "Chris's group…actually started demo and abatement," and that "Chris would

like to make a construction draw…to pay for the outstanding invoice related to the work.").

The government does not contest these emails were sent to CRBT or Moran. Nor does it

contest that Moran, in its monthly inspection reports to CRBT, identified Mr. Harrison as the

person doing demolition work for both Whitaker Park and Model Tobacco.  Defendant's Ex. 13 at Cedar_Rapids-00039443; Defendant's Ex. 14 at Cedar_Rapids-00038209.

Instead, it claims this "framing sidesteps the main issue." Govt. Resp. at 1.  But the main issue *is* whether Mr. Harrison was allowed to receive proceeds for demolition work that he organized, coordinated, and supervised.  The government has *repeatedly* argued that CRBT would have never disbursed loan proceeds if it knew these proceeds were going to Mr. Harrison or his affiliates.  Govt. Op. Br. at 10, Govt. Resp. at 11.  The emails above, as well as the cited inspection reports, show that CRBT *did* know that Mr. Harrison would be receiving proceeds for his work, and paid those proceeds anyway.

The government also tries to brush off these documents by claiming that there "is no dispute that Harrison was permitted to contract with genuine demolition vendors on behalf of the Projects in arms-length transactions." Govt. Resp. at 1.  But these emails to CRBT and Moran do not state that Mr. Harrison was contracting with demolition vendors in arms-length transactions. Instead, these emails explicitly state that Mr. Harrison and his group were doing demolition work, and that they expected to be compensated for it.

II.    **The Government Mischaracterizes Its Evidence of Virginia Demolition**

To avoid the plain language of emails to CRBT disclosing Mr. Harrison's involvement in demolition, the government instead accuses Mr. Harrison of hiding his affiliation with Virginia Demolition.

First, the government once again points to an email exchange between Mr. Harrison and fellow investor Andy Little (also referred to as A.L.).  Govt. Resp. at 2, 5; Govt. Op. Br. at 17-18. The government claims this email represents a "victim of the Virginia Demolition scheme learn[ing] of" Mr. Harrison's "fraud [on] June 22, 2022."  Govt. Resp. at 2.  **But the purported**

**"victim," Mr. Little, disputes almost every word the government utters in that sentence** —

so much so that he has written a second statement to the Court.  See Ex. 32.

In that statement, Mr. Little explains that the "issue that I was addressing in my

correspondence with Chris was not to question his taking a profit on the demolition." Ex. 32 at 2.

Instead, Mr. Little was critiquing Mr. Harrison's poor communication with his partners, and makes

clear that "[i]f Chris had communicated his intent up front and showed us the competitive bids, we

would have agreed to it" because as "it turned out, the rate for Chris's demolition work was in-line

with the market rates for such work." Ex. 32 at 3. Contrary to the government's characterizations,

Mr. Little "did not view" Mr. Harrison's work through Virginia Demolition "as a scheme to siphon

money off the project." Ex. 32 at 2.  **Mr. Little thus disagrees with the government's**

**characterization of this email *and* its categorization of him as a "victim" of Mr. Harrison's**

**"fraud."**

Next, the government *does* admit that Mr. Harrison "use[d] his business mailing address,"

which was 5301 Westbard Cir. Apt 147, Bethesda, MD, 20816, "as the registered address of

Virginia Demolition from its inception."  Govt. Resp. at 3.  But it states that "a victim would have

to independently know Harrison's business mailing address" to make the connection.  In fact,

CRBT *did* know Mr. Harrison's business mailing address, because it was on almost every email

Mr. Harrison sent.  *See* Ex. 33 (listing the same 5301 Westbard Cir. address under Chris Harrison's

signature block on emails sent to B.C. at CRBT).  The address for Mr. Harrison's company was

also used to send Mr. Harrison monthly account statements, and appears in official contracts signed

and reviewed by investors and lenders.  *See* Ex. 34 at 60-61 (Model Tobacco Operating

Agreement).

The government also faults Mr. Harrison for using Incorp Services, Inc., a registered agent service, arguing this tends "to reinforce Harrison's desire to conceal his affiliation with Virginia Demolition." Govt. Resp. at 3. This inference might be surprising to Incorp Services, who has been providing registered agent services to the public since 2001, and expressly offers those services to managers who are not residents of the state in which their business is incorporated. That is the reason one retains a registered agent. Mr. Harrison was living in Washington D.C. at the time, and thus used Incorp Services to ensure that Virginia Demolition had a registered agent in Virginia. And the person who registered Virginia Demolition as a corporation was Mr. Harrison's accountant, Kevin Moore.

Finally, the government continues to adopt S.L.'s statement "that he was never aware of Virginia Demolition," Govt. Resp Br. at 4 n.1, as well as his other claims that he did not have anything to do with the entity. As shown in Defendant's Ex. 24, S.L.'s own documents prove this to be false, and show that he knowingly received payments on at least two occasions through Virginia Demolition.

## III.    The Government Ignores the Plain Language of Other Agreements in This Case

Shifting its theory away from CRBT, the government also argues that Mr. Harrison withheld information from other "investors" about his personal involvement and receipt of loan proceeds from demolition work. Govt. Resp. at 5. But Mr. Harrison's agreement with other investors in Model Tobacco *explicitly* allowed the "Manager" (Mr. Harrison's company, McKenzie Blake) to award contracts to other "contractors and consultants," even if those contractors included "Members" (like Mr. Harrison and CAH Harrison LLC) or "Affiliates of Members." Ex. 34 (Model Tobacco Operating Agreement) at 16, Section 3.02(c).

8

> 3.02   **Authorized Activities.** Subject to the provisions of this Agreement, including, without limitation, the provisions of Section 7.01(a) below, the Manager is authorized to cause the Company to take all actions necessary or appropriate to carry out the purposes and business of the Company, including, but not limited to, the following:
>
> (a)   Enter into and perform all acts and carry out all obligations under all contracts and agreements necessary or incidental to the accomplishment of the purposes and business of the Company, as set forth in Section 3.01 above;
>
> (b)   Cause the Company to borrow money and issue evidences of indebtedness from Persons in furtherance of any or all of the purposes and business of the Company (which Persons may include Persons holding a direct or indirect ownership interest in any Member and Affiliates of any Member), to guaranty the same, and to secure the same by mortgage, pledge or other lien on Company Property, or any portion thereof;
>
> (c)   Cause the Company to employ Persons in the operation and management of the business of the Company, including, without limitation, attorneys, accountants, mortgage bankers, management and leasing agents, insurance brokers, real estate brokers, mortgage brokers, engineers, architects, contractors and consultants, which Persons may include Members and Affiliates of Members;

As discussed in the Defense Response, Virginia Housing's General Conditions of Construction and Construction Contract also explicitly gave Mr. Harrison the right to perform work on the project, and the accompanying construction contract stated that most demolition would be "by owner." Defense Ex. 11 at 13, 34.  Virginia Housing reviewed and approved both of these contracts in writing. Defense Ex. 11 at 3.  And the government does not dispute, nor could it, that CRBT received and reviewed copies of these contracts *as well as* the Model Tobacco Operating Agreement between the investors.

## IV.   Mr. Harrison Added Value to the Model Tobacco and Whitaker Park Projects

The government next contends that Mr. Harrison simply used Virginia Demolition as a way to mark up invoices submitted by subcontractors.  As multiple real estate professionals attest in their statements to this Court, this argument minimizes the work Mr. Harrison did:

- Mr. Little, the investor in Whitaker Park and a broker for real estate development financing, notes that Mr. Harrison hired and coordinated the work of subcontractors, but also "overs[aw] their work to make sure nothing was taken out of the building that would hurt the ability of the project to obtain historic tax credits. This is time consuming work with a lot of responsibility, and Chris was entitled to a fee for this work." Ex. 32 at 2.

9

- Mr. Little also notes that Mr. Harrison's management of the demolition "ensured that the project avoided the loss of valuable tax credits," and that as an investor in Whitaker Park, Mr. Little "did not view [Virginia Demolition] as a scheme to siphon money off the project." Ex. 32 at 2.

- Chris Hanna, who provided consulting and business services to Mr. Harrison on both projects, states that Mr. Harrison's work involved "many hours of onsite supervision, planning, and coordination, as well as developing strategies to overcome unforeseen demolition obstacles…." Ex. 35 at 2. This is because the "project was incredibly complex," and demolition "required assessing and removing turbines, concrete piers, old equipment, asbestos pipes, and resolving a variety of other challenges." Ex. 35 at 2.

- Mr. Harrison's work supervising and coordinating demolition efforts required numerous additional site visits and personal expenses. For example, Mr. Harrison personally paid for housing of demolition workers at Whitaker Park. *See* Ex. 36; Def. Resp. at 8.[3]

Furthermore, the fact that Mr. Harrison hired vendors and subcontractors to do demolition work is not evidence of fraud. Indeed, general contractors like Mark Turner Construction also hire subcontractors to actually do the work required on a project. *See* Defense Ex. 17 (Govt. Interview of F.B., President of Mark Turner Construction), at 2-3 ("[F.B.] had completed the process of planning and bidding out the project to subcontractors."). Mr. Little notes that to some degree, "all contractors use subcontractors" and a "general contractor is a prime example — they get paid a fee to oversee all the subcontractors and run the job." Ex. 32 at 3.

Under the government's theory, a general contractor would be exposed to charges of fraud and invoice inflation any time that contractor took profit or compensation for coordinating, managing, and supervising subcontractors. The invoice submitted by a general contractor like Mark Turner will not simply equal the sum of the prices charged by its subcontractors. The same

---

[3] The government does not challenge the $4.3 million in additional contributions to the project made by Mr. Harrison and confirmed by Cohn Reznick, but did request evidence of additional demolition expenses excluded from the government's calculations. The Defense is willing to continue conferring with the government on these calculations.

holds true for Mr. Harrison, who functioned as a general contractor for demolition in order to save money for both projects.

As Mr. Little notes, "[m]any general contractors and developers self-perform work if they believe they can do it at a reasonable market price, and they make a fee on that self-performed work." Ex. 32 at 3. Of course, the "overall fee must be reasonable and budgeted and, in the case of construction draws, both the budget and the work is inspected by a third-party consultant, who ensures the budget and work is reasonable." Ex. 32 at 3. That was the case here: "The demolition work that Chris supervised and took a fee for was in line with the market rates for such work." Ex. 32 at 2. In fact, the government does not contest that monthly inspection reports by CRBT's own construction consultants thought that demolition work being billed was representative of the actual work being completed on site.

Finally, the government also does not contest the expert analysis by an independent auditor from Grant Thornton, Defendant's Ex. 21, which reviewed transactions related to Mr. Harrison and the Model Tobacco Project. That auditor did not uncover "any funds intended for the Model Tobacco Development" that "were used for Harrison's personal benefit or to the benefit of any other projects." Defendant's Ex. 21 at Par. 9.

## V.    The Fair Market Value of the Demolition Services Provided Exceeds What These Projects Spent on Demolition

The government's next argument, that Mr. Harrison provided "nonexistent services," is contradicted by the professionals and investors who worked with Mr. Harrison on both projects, like Mr. Hanna and Mr. Little. The government also critiques the Defense's fair market value calculation, arguing that the fair market value is *not* the value of bids submitted on an open market by competitor contractors, but instead is merely the internal cost those contractors incur when offering their services. Govt. Resp. at 7. In essence, the government argues that the "fair market

value" of services provided by a company cannot be higher than the raw costs of providing those services. This definition of "fair market value" would mean that the value of services provided by a manager or supervisor would always be zero.

By contrast, the Defense uses the term in a manner that gives credit to managerial or supervisory work. The Defense's calculation also presents an apples-to-apples comparison. If a project like Model Tobacco hired a contractor to oversee demolition and coordinate with vendors and subcontractors to complete that demolition, it would expect to pay the prices quoted for demolition by Mark Turner Construction, Weaver Cooke, Frank Blum Construction, and Capstone. The prices those general contractors charge for demolition include the cost of vendors and subcontractors, and include fees for overseeing and coordinating demolition so that historical tax credits are not jeopardized. As Mr. Little notes, that is *exactly* the same service that Mr. Harrison and Virginia Demolition provided. Ex. 32 ad 2-3. The bids from these other contractors estimate the "price that a seller [here, the general contractor managing demolition] is willing to accept and a buyer [here, the property being developed] is willing to pay on the open market and in an arm's length transaction." *Value*, Black's Law Dictionary (12th ed. 2024).

The government next claims, without offering any evidence in support, that the Defense's definition of fair market value will lead to developers soliciting "inflated contractor bids." Govt. Resp. at 7. But it offers no explanation for why independent contractors, competing with each other on the open market to solicit business from property development companies, would have incentives to *inflate* their bids. It also offers no explanation for how Mr. Harrison improperly included abatement costs, nor does it explain how the Defense's analysis, an audit by Grant Thornton, and other investors and professionals all come to the same conclusion: Mr. Harrison

provided demolition services lower than or at most in-line with market rates.  Defense Exhibits 3 to 8; 22; 35; 32.

Finally, the government points to the unpublished decision of *United States v. Butler*, 578 Fed. App'x 179 (4th Cir. 2014), but the comparison is inapt.  *Butler* rejected an offset for fair market value of services performed because the defendant did not provide "legitimate services;" the defendant had pled guilty to concealing from the victim, his employer, that he was the one performing services over the course of a seven-year scheme. 578 Fed. App'x at 182.  Mr. Harrison, in contrast, *disclosed* that he was performing demolition services to CRBT and its construction consultant, and in documents both Virginia Housing and CRBT reviewed. Def. Resp. at 4-6.

Further, Mr. Harrison explicitly had the right to perform such services based on the terms of his operating agreement with other investors; the defendant in *Butler* had no such right with his employer.  Ex. 34 (Model Tobacco Operating Agreement) at 16, Section 3.02(c); *Butler*, 578 Fed. App'x at 182.  And one of Mr. Harrison's fellow investors in the Whitaker Park project was pleased with the result.  *See* Ex. 32 at 1 (Mr.  Little describing Mr. Harrison's "performance and supervision of the demolition work," which Mr. Little "did not view…as a scheme to siphon money").

Additionally, because Butler was *employed* by the party hiring subcontractors, CH Construction, he was simply doing his job when hiring subcontractors, and not providing additional value to the company. 578 Fed. App'x at 182. By contrast, Mr. Harrison performed labor that added legitimate value to the project by providing general contractor services and ensuring demolition was completed according to specifications. Def. Resp. Br. at 8. *See also* Ex. 32 at 2, (stating Mr. Harrison had to "oversee the work to make sure nothing was taken out of the building that would hurt the ability of the project to obtain historic tax credits," and that his "performance and supervision of the demolition work…ensured that the project avoided the loss of valuable tax

credits"). Mr. Harrison conducted site visits, obtained vendor equipment, covered expenses, and otherwise oversaw the demolition process — none of which he was obligated to do through a pre-existing agreement.

Finally, Butler's scheme was pure theft from his employer, artificially charging high amounts to contract with his own business. 578 Fed. App'x at 182. Mr. Harrison received competitive demolition bids and provided services cheaper than those alternate bids. Def. Op. Br. at 9-11. The demolition work performed by Virginia Demolition was also inspected by a third party, ensuring it met quality and cost standards. Def. Resp. at 8.

The government's interpretation of *Butler* contradicts the plain language of the Guidelines. As the Guidelines state, "loss shall be reduced" by "the fair market value of the property returned and the services rendered[ ] by the defendant." *See* U.S.S.G. § 2B1.1 cmt. 3(D)(i). By applying the *Butler* rule to *any* labor that could be connected in any way to a mere allegation of criminal activity, the government would eviscerate this Guidelines provision. Most labor performed by the defendant will bear some relationship with the government's alleged offenses or relevant conduct. Under the government's conception of *Butler*, *any* connection would be sufficient to classify labor or services provided by a Defendant as being done "in furtherance" of a criminal enterprise. It would make almost all labor inapplicable for a credit for fair market value of services that the Guidelines say "shall" be applied.

## VI.     Mr. Harrison Took Any Funds Gained from Virginia Demolition and Used it to Support the Model Tobacco Project

The government does not dispute that Mr. Harrison used personal funds, through CA Harrison LLC, to support the Model Tobacco Project after construction to the tune of $4.3 million—nor could it. As shown in Defense Exhibits 9 and 10, these amounts were validated during multiple years by independent auditor Cohn Reznick. The amounts are also corroborated

14

by witnesses.  Mr. Hanna, for example, writes that he personally saw Mr. Harrison "sell other assets" and "invest what could have been a retirement for him and his family into the Model Tobacco Project." Ex. 35 at 3.

As discussed, if the Court adopts the government's theory that money Mr. Harrison gained by working on Virginia Demolition represented a loss to the Model Tobacco project and its investors, then that loss amount must be offset (1) by Mr. Harrison's ownership percentage as an investor in the Model Tobacco project (conservatively estimated to be at least 14.75%); and (2) by any money returned by Mr. Harrison to the Model Tobacco project and its investors.  U.S.S.G. § 2B1.1 cmt. n.3(D)(i).  When Mr. Harrison used personal funds to pay expenses incurred by the Model Tobacco project, he returned money to the Model Tobacco project and its investors.  Thus, the loss amount claimed by the government must be reduced by the $4.3 million that Mr. Harrison returned to the project. Any proceeds that Mr. Harrison gained from Virginia Demolition were poured back into the project to pay off these post-construction expenses.[4]

The government points to an entry Mr. Harrison made in the Model Tobacco bankruptcy proceedings for an unrelated transaction.  Govt. Resp. at 10 (citing GX-12 at 2, which shows a claim of $4,731,304).  But both Mr. Harrison and K.R. are personal guarantors of the outstanding CRBT loan.  Although funds currently exist to repay the CRBT loan, (*see* Defense Ex. 30 at Part 11, Line 78), K.R. and Mr. Harrison serve as backup guarantors. Thus, CRBT, K.R., and Mr. Harrison have all entered claims for $4,731,304, representing their potential personal exposure. The government also claims that the $4.3 million that Mr. Harrison used to support the project was

---

[4] The government claims that $2.8 million in expenses were incurred after June 22, 2022, which is when the government claims a "victim[] discovered the fraud scheme." Govt. Resp at 11, n.5. As discussed previously, the "victim" referenced in the June 22 communication (Andy Little) disagrees that he is a "victim" at all, or that he "discovered" a "fraud scheme." Ex. 32. Even if that weren't so, this would still leave $1.5 million in credits to offset any loss amount.

made to benefit his own equity.  But this confuses Mr. Harrison's equity stake in the project (which is at least 14.75%) with additional money he put into the project *over and above* his required contributions as an investor.

Finally, the government argues that much of this amount is not for demolition costs, and it does nothing to help CRBT for loan proceeds it distributed. But if this is the case, the government has switched its theory back to CRBT as the "victim," in which case the loss amount is zero, because money currently exists to pay off the entire loan balance.

## VII.    The Future of Model Tobacco and Harm to Investors

The government finally notes that even if Model Tobacco is a success that can make other investors money, this is irrelevant, because Mr. Harrison still deserves "substantial punishment" for his conduct.  To arrive at that "substantial punishment" level of more than 11 years, the government represents to this Court that investors will suffer substantial financial hardship.  This representation allows the government to increase its recommended offense level by 4 levels (from 27 to 31), which increases its recommended sentence by 48 months.  *See* Govt. Op. Br. at 10-11.

But ongoing bankruptcy proceedings undercut these representations.  Both S.S. and M.K. (despite claiming losses today) stand to receive a healthy return on their investment once their existing settlement is paid.  Furthermore, both are taking steps to obtain a larger share of the property's proceeds and secure a preferential stake that would magnify their returns.  PSR at 54-55 (noting that under a potential bankruptcy plan, S.S. and M.K. could own 90% of Model Tobacco development going forward, and that their existing settlement with Mr. Harrison "far exceeds the amount actually invested" by them). This increase in stake will likely come at the expense of Mr. Harrison.  From a "dollar-for-dollar loss perspective, the person who will lose the most because of what has happened is [Mr. Harrison]. He put millions of his own funds into the project," and these

16

interests may be "invalidated in bankruptcy court as these other investors are now in more control of the project and the process." Ex. 35 at 3.

There is clearly value in Model Tobacco and it is anticipated that there will be offers that will pay off the existing loans and provide funds for these investors, just like there was in 2024 before certain partners withheld consent. *See* Ex. 37 (Supplemental Statement of Carissa Barry) at 3. But that is uncertain. If the Court is inclined to conclude that the investors, not CRBT, are the victims here, the Defense respectfully suggests a continuance of sentencing would be appropriate. The Defense is well aware that we are in the Eastern District of Virginia and that continuances are disfavored. But justice would not be delayed by such a continuance. Mr. Harrison is incarcerated and will remain incarcerated. Continuing sentencing until Model Tobacco has emerged from bankruptcy — or at least until it is clear how the investors are going to fare in the bankruptcy — would allow a concrete determination of the actual returns to investors if the Court were to determine that they, not CRBT, are the victims that need to be considered.

## CONCLUSION

As the government concedes, both the Model Tobacco and Whitaker Park projects are valuable assets that currently provide housing to hundreds of residents. Investors and real estate professionals recognize that Mr. Harrison's dedication to these projects made them possible, and friends and family recognize that Mr. Harrison has offered and still has much to offer his community. These factors, coupled with the need to avoid sentencing disparities, counsel in favor of a sentence of 41 months. That sentence is sufficient but not greater than necessary to punish Mr. Harrison for this offense, provide general and specific deterrence, and help rehabilitate Mr. Harrison into once again serving as a productive member of the community. A letter from Mr. Harrison is attached as Exhibit 31.

Respectfully submitted,

/s/ *Robert M. Cary*
Robert M. Cary
Virginia Bar No. 32000
Ashwin G. Shandilya
Virginia Bar No. 91062
*Counsel for Defendant*
WILLIAMS & CONNOLLY
680 Maine Ave, S.W.
Washington, D.C. 20024
Telephone: (202) 434-5493
Facsimile: (202) 434-5029
Email: rcary@wc.com

18