IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

        v.                                   Criminal No. 3:24cr152 (DJN)

CHRISTOPHER A. HARRISON,
    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on the United States of America's (the "Government") Motion for Entry of a Preliminary Order of Forfeiture and a Restitution Judgment (ECF No. 74). Following Defendant Christopher A. Harrison's ("Defendant") guilty plea to a one-count criminal information charging him with wire fraud under 18 U.S.C. § 1843 (ECF No. 37), the Court held a sentencing hearing on June 17, 2025, during which it sentenced Defendant to 71 months of incarceration and three years of supervised release. (ECF No. 72.) At the Government's request, the Court deferred making a ruling on forfeiture and restitution at that time. The Government now moves the Court for an entry of both a forfeiture order and a restitution judgment. (ECF No. 74.) While the parties have stipulated to the proper amount for each order, Defendant reserved the right to present legal argument as to a host of issues materially affecting the Government's Motion. (ECF No. 73.) Defendant presented several such arguments in his Response to the Government's Motion. (ECF No. 77.)

For the reasons set forth below, the Court will GRANT the Government's Motion (ECF No. 74). The Court will order restitution and forfeiture in the amounts stipulated by the parties. The Court will also make a finding that the requirements of 21 U.S.C. § 853(p), the substitute asset statute, have been satisfied at this time.

## I.    BACKGROUND

On October 15, 2024, a grand jury in the Eastern District of Virginia returned a twelve-count indictment against Defendant, charging him with wire fraud, mail fraud, engaging in monetary transactions in criminally derived property and aggravated identity theft. (ECF No. 3.) On January 21, 2025, the grand jury returned a superseding indictment, again charging Defendant with twelve counts, including wire fraud, engaging in monetary transactions in criminally derived property and aggravated identity theft, but removing the mail fraud charge. (ECF No. 34 ("Superseding Indictment" or "Sup. Ind.").)  As described in the Superseding Indictment, Defendant's scheme to defraud consisted primarily of skimming loan proceeds from two commercial real estate projects whose development he led:  the Model Tobacco Project in Richmond, Virginia, and the Whitaker Park Project in Winston-Salem, North Carolina. (*Id.* ¶¶ 17–44.)  The Superseding Indictment articulated the primary purpose of this scheme as follows:  "to unjustly enrich [Defendant] by misappropriating loan proceeds intended for the development and construction of the Model Tobacco and Whitaker Park Projects . . . through various means." (*Id.* ¶ 18.)  The Superseding Indictment proceeded to describe these "various means," which "included, but were not limited to," the following:

1.   In late October 2020, Defendant submitted a fraudulent invoice and lien waiver to Cedar Rapids Bank & Trust ("CRBT"), which resulted in a loan payment of approximately $212,306 to Virginia Demolition, an entity that Defendant had created mere days before receiving the payment. (*Id.* ¶¶ 20–27.)  Virginia Demolition never had any employees, office space or assets. (*Id.* ¶ 24.)

2.   In late January to early February 2021, Defendant altered invoices from Dickens Construction ("Dickens"), a contractor performing excavation work on the Model

2

Tobacco project, to falsely reflect a greater balance owed. (*Id.* ¶ 31.) Defendant then submitted these altered invoices to CRBT (along with invoices for his own entity, Virginia Demolition), resulting in a loan payment of approximately $1,338,564, which included approximately $95,200 for Dickens and approximately $191,565.64 for Virginia Demolition. (*Id.* ¶¶ 29–33.)

3.      In June and July 2021, Defendant similarly falsified documents and submitted them to CRBT for reimbursement. (*Id.* ¶¶ 34–38.) These submissions concerned the Whitaker Park project in North Carolina and resulted in a payment by CRBT of approximately $2,311,668, including approximately $599,672 to Virginia Demolition. (*Id.*)

The Superseding Indictment also contained a forfeiture notice, including as property subject to forfeiture "[a] sum of money of at least $3,665,154.42, which represents the amount of proceeds the defendant obtained from the offenses of conviction." (*Id.* at 20.)

On January 27, 2025, the Government filed a criminal information consisting of one count of wire fraud, to which Defendant pled guilty the following day. (ECF No. 37 ("Information"); ECF No. 38.) The Information defines Defendant's scheme in similar terms to the Superseding Indictment, but employing slightly different language.[1] Beginning with the primary purpose and object of Defendant's fraud scheme, the Information stated as follows:

> The primary purpose and object of [Defendant's] scheme was to: (1) generate falsified and inflated contractor invoices and lien waivers; (2) submit falsified and inflated invoices to CRBT and [the Virginia Housing Development Authority ("VHDA")] for loan disbursement; (3) enrich himself with inflated loan proceeds; and (4) conceal [Defendant's] falsification of invoices and lien waivers from CRBT and VHDA.

---

[1]     The parties also filed a Statement of Facts, which recounts the Information's factual allegations verbatim. (ECF No. 40.)

3

(Information ¶ 11.)  As to the manner and means of Defendant's scheme, the Information began by stating that the "various ways and means through which [Defendant] sought to accomplish the purpose of his scheme to defraud *included* the following."  (*Id.* ¶ 12 (emphasis added).)  Paragraphs 13 to 16 of the Information contain the same factual allegations concerning Defendant's altering of invoices from Dickens Construction as the Superseding Indictment.  (*Compare id.* ¶¶ 13–16, *with* Sup. Ind. ¶¶ 31a–33.)  The Information additionally specified that Defendant's Dickens-specific gains were "$59,723 more than [Defendant] would have received based on the work performed and invoiced by Dickens Construction."  (Information ¶ 16.)  The Information also set forth an additional sequence of events demonstrating Defendant's fraudulent scheme, related to a similarly-altered Dickens invoice, which resulted in a payment of $104,526 more than Defendant would have received from CRBT for the work actually performed.  (*Id.* ¶¶ 17–20.)  This allegation covers the same factual predicate that underpins count four of the Superseding Indictment.  (Sup. Ind. at 15.)

On June 17, 2025, the Court sentenced Defendant to 71 months of incarceration and three years of supervised release.  (ECF No. 65.)  In so doing, the Court found Defendant's total illicit gain from his fraudulent scheme to be $1,719,902.18.  (ECF No. 72 ("Sentencing Hearing Transcript" or "Sent. Hr'g Tr.") 7:16–21.)  The Court based this total on CRBT loan payments related to invoices involving Dickens Construction and Virginia Demolition, and covering both the Model Tobacco and Whitaker Park projects.  (*Id.*)  The Court reserved judgment on forfeiture and restitution and set a briefing schedule to address these issues, encouraging the parties to find agreement.  (ECF No. 63.)

The parties subsequently filed a "Stipulation Regarding Forfeiture and Restitution." (ECF No. 73 ("Stipulation").)  There, the parties agreed that "if restitution is ordered, the amount

4

of restitution shall be $1,113,492.60, to be paid to Model Tobacco Development Group LLC (or its successor)." (*Id.* ¶ 1.) The parties similarly agreed that "if forfeiture is ordered, the amount shall be $1,631,424.19, which represents the proceeds the Defendant obtained minus deductions for certain credits against losses." (*Id.* ¶ 2.) Defendant preserved the right to raise legal arguments regarding restitution and forfeiture, but agreed that "[i]f the Court rejects the Defense's legal arguments . . . the [stipulated] restitution and forfeiture amounts are accurate and correctly calculated." (*Id.* ¶ 4.)

The Government subsequently filed the instant Motion for an entry of a forfeiture order and a restitution judgment. (ECF No. 74 ("Motion" or "Mot.").) The Government also requests a finding that the requirements of 21 U.S.C. § 853(p) for substitute assets have been satisfied. (*Id.* at 17–19.) In his Response, Defendant presented several legal arguments in opposition to the Government's Motion. (ECF No. 77 ("Response" or "Resp.").) The Government, in turn, submitted a reply brief opposing Defendant's legal arguments, (ECF No. 86 ("Reply")), rendering this Motion ripe for the Court's review.

## II.    LEGAL STANDARD

### A.    Forfeiture

18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c), provides the statutory authority for criminal forfeiture.[2] That statute designates as subject to forfeiture "[a]ny property,

---

[2]    28 U.S.C. § 2461(c) is an incorporation statute enacted as part of the reforms of the Civil Asset Forfeiture Reform Act of 2000. Section 2461(c) allows the Government to seek forfeiture in a criminal prosecution based on statutes which provide for civil forfeiture. *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014) ("Section 2461 . . . acts as a bridge or gap-filler between civil and criminal forfeiture, authorizing criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized.") (internal quotation marks and citing references omitted).

real or personal, which constitutes or is derived from proceeds traceable to a violation of [any of 34 enumerated offenses] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). "Specified unlawful activity" includes "any act or activity constituting an offense listed in Section 1961(1) of this title except [certain Title 31 offenses]." 18 U.S.C. § 1956(c)(7)(A). 18 U.S.C. § 1961(1), in turn, expressly covers convictions for wire fraud, rendering such convictions eligible for forfeiture. *See United States v. Hailey*, 887 F. Supp. 2d 649, 653 (D. Md. 2012) ("Under [] § 981(a)(1)(C), all proceeds traceable to mail and wire fraud are subject to forfeiture.").

Forfeiture constitutes a mandatory element of sentencing for forfeiture-eligible offenses. *See* 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court *shall* order the forfeiture of the property as part of the sentence in the criminal case") (emphasis added); *United States v. Blackman,* 746 F.3d 137, 143 (4th Cir. 2014) ("The word 'shall' does not convey discretion. . . . The plain text of the statute [] indicates that forfeiture is not a discretionary element of sentencing.") (internal quotation omitted). As the Fourth Circuit emphasized in *Blackman*, forfeiture remains mandatory even where a court imposes restitution, as the two "serve distinct purposes: restitution functions to compensate the victim, whereas forfeiture acts to punish the wrongdoer." *Blackman*, 746 F.3d at 143. Courts may not deny forfeiture based on equitable considerations or a defendant's inability to pay. *Id.* at 143–44. The Court's forfeiture determination "may be based on evidence already in the record . . . or information submitted by the parties." Fed. R. Civ. P. 32.2(b)(1)(B).

Where a defendant pleads guilty to a single fraud count within a larger fraud scheme, forfeiture may extend to that defendant's illicit gains from the entire scheme as originally

charged. *See United States v. Budden*, 2012 WL 1315366, at *3 (D.S.C. Apr. 17, 2012) (noting

that, where a defendant pleads guilty to a single mail fraud count that is "part of a fraudulent

scheme, forfeiture is not limited to that single count but should cover the entire scheme"); *United*

*States v. Emor*, 850 F. Supp. 2d 176, 217 (D.D.C. 2012) ("When a defendant has engaged in a

mail or wire fraud scheme, forfeiture is not limited to the proceeds gained through the particular

mailing or wire transaction on which the conviction was based; rather it extends to the entire

scheme of which the mailing or wire transaction was a part.") (internal quotation omitted).

Circuit courts have likewise agreed that, in scheme-based fraud offenses, forfeiture includes

proceeds from all executions of the scheme, even those not specifically charged or that resulted

in acquittal. *See United States v. Cox*, 851 F.3d 113, 128–29 (1st Cir. 2017) (agreeing with other

circuits that "in the case of crimes that involve a scheme to defraud, funds obtained as a result of

the offense consist of the funds involved in that fraudulent scheme, including additional

executions of the scheme that were not specifically charged or on which the defendant was

acquitted") (cleaned up); *United States v. Lo*, 839 F.3d 777, 792–93 (9th Cir. 2016) (same);

*United States v. Venturella*, 585 F.3d 1013, 1015 (7th Cir. 2009) ("The mail fraud count that the

defendants were convicted of also alleged a broader scheme to defraud. . . . As a result, the

forfeiture is not limited to the particular mailing but extends to the entire scheme.").

      Federal Rule of Criminal Procedure 32.2 sets forth the procedure to effect criminal

forfeiture. First, the Government must include a forfeiture allegation in its indictment. Fed. R.

Crim. P. 32.2(a). Upon conviction, if the government satisfies its burden to establish a nexus

between the property for which forfeiture is sought and the crime committed, the district court

enters a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b)(2).

## B.    Restitution

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, governs restitution where defendants stand convicted of any Title 18 "offense against property." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)–(B). The MVRA provides that a district court "shall order . . . that the defendant make restitution to the victim of the offense" upon such a conviction. 18 U.S.C. § 3663A(a)(1). The statute defines the term "victim" to include persons "directly and proximately harmed as a result of the commission of an [eligible] offense." 18 U.S.C. § 3663A(a)(2). Where an eligible offense "involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct *in the course of the scheme, conspiracy, or pattern*" qualifies as a victim for purposes of the MVRA. *Id.* (emphasis added). Whenever a defendant stands convicted of an eligible offense, a district court "shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *see United States v. Roper*, 462 F.3d 336, 337–40 (4th Cir. 2006) (noting that the MVRA removed any discretion on the part of the sentencing court to order restitution constituting less than the full amount of the victims' losses, irrespective of the defendant's financial situation).

The Government bears the burden of proving the victims' losses by a preponderance of the evidence. 18 U.S.C. § 3664(e). The district court must "attempt to come to a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim." *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (internal quotation omitted). A restitution order may be "enforced against all property or rights to property" of a defendant "[n]otwithstanding any other Federal law." 18 U.S.C. § 3613(a). By

8

extending restitution's reach to "*all* property or rights to property," Congress "made quite clear that the totality of defendants' assets will be subject to restitution orders." *United States v. Novak,* 476 F.3d 1041, 1046 (9th Cir. 2007) (emphasis in original).

Mail fraud constitutes a crime against property under Title 18 of the United States Code and therefore falls within the MVRA's scope. *United States v. Lomas*, 392 F. App'x 122, 127 (4th Cir. 2010). The Fourth Circuit has recognized that, for MVRA purposes, victims affected by mail fraud "include all persons harmed by [the defendant] 'in the course of his participation in the scheme.'" *Id.* (citing § 3663A(a)(2)). Courts in the Fourth Circuit may order restitution for losses that result from a criminal scheme "regardless of whether the defendant is convicted for each criminal act within the scheme, so long as the loss is a direct result of the defendant's criminal conduct *or is closely related to the scheme*." *United States v. Karam*, 201 F.3d 320, 325–26 (4th Cir. 2000) (internal quotation omitted) (emphasis added); *see Lomas*, 392 F. App'x at 128 ("[A] sentencing court may order restitution for losses resulting from a scheme even if the defendant is not convicted of each individual criminal act, e.g., indictment count, as long as the acts are the direct result of the defendant's criminal conduct or are closely related to the scheme.") (internal quotation omitted); *see also United States v. Brock-Davis,* 504 F.3d 991, 999 (9th Cir. 2007) ("[W]hen the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, . . . the restitution order [may] include acts of related conduct for which the defendant was not convicted.") (internal quotation omitted); *United States v. Holthaus,* 486 F.3d 451, 458 n.6 (8th Cir. 2007) (explaining that the MVRA authorizes restitution for every victim harmed in the course of a defendant's scheme, not just by the offense of the conviction); *United States v. Hensley,* 91 F.3d 274, 277 (1st Cir. 1996) ("[T]he outer limits of a . . . restitution order encompass all direct harm from the criminal conduct of the defendant

which was within any scheme, conspiracy, or pattern of activity that was an element of any offense of conviction.").

## III.    ANALYSIS

The Government seeks forfeiture in the amount of $1,631,424.19, representing the proceeds that Defendant obtained as a result of the fraud scheme charged in Count One of the Information to which he pleaded guilty. (Mot. at 5.) The Government also seeks a restitution judgment in the amount of $1,113,492.60 on behalf of the victim in this case, Model Tobacco Development Group LLC. (*Id.*) That amount represents the actual loss amount that Model Tobacco Development Group LLC sustained due to Defendant's fraud, but it does not include any amounts related to the Whitaker Park Project, where CRBT, the lending bank, was "ultimately made whole." (*Id.* at 3, 5.) While Defendant conditionally stipulates to these amounts, Defendant also raises several legal objections that, in his view, negate the propriety of either remedy. The Court proceeds to address these arguments, beginning with Defendant's objections concerning restitution before proceeding to his objections concerning forfeiture.

### A.    Restitution Objections

Defendant presents two objections to the Government's Motion as it relates to restitution. Defendant argues that Defendant's conduct caused no losses for purposes of restitution, based on his own reinvestments, his ownership stake and the value of services that he provided to the Model Tobacco project. (Resp. at 5–6.) Defendant also argues that the scope of the restitution sought is too expansive, since restitution must be limited to only those losses stemming from the offense of conviction, rather than related conduct. (*Id.* at 2–5.) The Court analyzes each of these objections in turn.

### 1.    Lack of Losses by Model Tobacco Investors

Defendant argues that Model Tobacco investors — the relevant victims identified by the Government for purposes of restitution — incurred no losses and therefore are owed no restitution whatsoever. Defendant bases this assertion on three facts. First, Defendant purportedly poured up to $4.3 million of the proceeds that he obtained through his Virginia Demolition entity back into the Model Tobacco property. (*Id.* at 5.) These contributions, in Defendant's telling, more than offset any losses incurred by other investors. (*Id.*) Second, Defendant argues that the Government's restitution calculation fails to account for the fair market value of any services that Defendant provided to the Model Tobacco project through his Virginia Demolition entity. (*Id.* at 6.) Again, in Defendant's view, those services offset any losses to investors, resulting in a loss amount of zero dollars. (*Id.*) And third, Defendant argues that the Government's figure fails to account for Defendant's ownership stake of "at least" 14.5% in Model Tobacco, which he contends offsets any restitution obligation, since Defendant cannot constitute a victim of his own scheme. (*Id.*)

Defendant's arguments stand in direct tension with the Stipulation filed by the parties, in which Defendant "agreed to the amount of restitution . . . that should be ordered in this case if the Court rejects [Defendant's] legal arguments" and represented that "the restitution and forfeiture amounts are accurate and correctly calculated." (Stipulation at 1–2.) Defendant's arguments effectively ask the Court to recalculate the agreed-upon restitution amount to varying degrees: pursuant to his first and second arguments, the Court should adjust that amount down to zero based on offsets, while Defendant's third argument suggests a reduction of at least 14.5% based on his ownership stake. (Resp. at 5–6.) Defendant formulates these recalculation requests as "legal" arguments, claiming that "there were no improper . . . losses caused by [Defendant's]

conduct for purposes of restitution," and that therefore, restitution stands inappropriate to his case as a whole. (Stipulation at 1; Resp. at 5.)

The Court rejects Defendant's arguments, because they fail to constitute "legal arguments" that justify setting aside the parties' Stipulation. In this posture, the Court recognizes a legal argument as one that challenges the Court's authority to impose restitution at all, assuming the accuracy of the stipulated restitution amount. By contrast, objections that depend on recalculating that amount by applying credits, offsets, or alternative valuations instead raise factual disputes about the Government's accounting, not legal barriers to imposing restitution in the first place. Defendant's arguments fall squarely in the latter category, even if their new calculation amounts to no restitution at all, because they presuppose that the stipulated *amount* is incorrect and ask the Court to revisit the underlying calculation. (Resp. at 6.) If the Government indeed "failed to account for" certain credits to which Defendant felt entitled, Defendant could have raised such accounting errors to the Government during their negotiations and, barring an amicable resolution of his concerns, should have withdrawn his agreement to the Stipulation. Instead, Defendant seeks to have his cake and eat it too, obtaining the benefit of a stipulated amount (and the Government's commitment not to request more) only to lean on the Court for a favorable recalculation of that amount. The Court finds no principle of law to assess here, only factual disputes surrounding the application of credits and offsets. As such, the Court finds that Defendant's objection fails to qualify as a "legal argument" and rejects it on that basis.

Additionally, even if the Court were to construe Defendant's objection as a legal objection beyond the Stipulation's scope, the Court would reject it for lack of merit. As framed in Defendant's papers, Defendant suggests that, as a matter of law, "there were no . . . losses caused by Mr. Harrison's conduct for purposes of restitution." (Stipulation at 1; Resp. at 5.) The

Court has already found otherwise. Based on an extensive review of the parties' submissions, the Court explained during Defendant's Sentencing Hearing that it would rely on Defendant's illicit gains for purposes of calculating his sentence, rather than the losses incurred by victims.[3] (Sent. Hr'g Tr. 6:22–7:5.) The Court nonetheless found that although the precise amount would be difficult to ascertain until bankruptcy proceedings had run their course, an appropriate loss number in this case would have amounted to "well over 1.5 million."[4] (Id. 7:23–8:4.) Defendant has provided no new arguments that would justify disturbing the Court's earlier finding, which lies well above the stipulated figure here. Therefore, even if Defendant's objection properly raised a "legal question" beyond the Stipulation's scope (which it does not), the Court finds this objection without merit and overrules it accordingly.

### 2.    Scope of the Proposed Restitution Order

Defendant also objects to the Government's reliance on criminal conduct beyond that specifically enumerated in the Information. Defendant highlights that the MVRA permits restitution only for victims of "the offense of conviction," and does not permit restitution for relevant conduct. (Resp. at 2–3.) Since Defendant pleaded guilty only to the one-count Information, which enumerates factual allegations related only to Dickens Construction and never mentions Virginia Demolition or Whitaker Park, Defendant argues that any losses related to these two entities fail to qualify as part of the "same scheme or pattern of conduct" and thus

---

[3]    See U.S. SENT'G GUIDELINES MANUAL §2B1.1(b)(1)(B) (Nov. 2024) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.")

[4]    The Court arrived at this number by starting with the $6 million unpaid judgment against Defendant in a related civil proceeding brought by his co-investors and offsetting this amount by roughly $3.9 million in credits. (Sent. Hr'g Tr. 7:5–9; 7:23–8:4.) In so doing, the Court emphasized that a forensic accounting could yield an even higher loss figure. (Id. 8:3–4.)

fall beyond the permissible scope of a restitution order in this matter. (*Id.* at 4–5.) On that basis, Defendant submits that $190,036.77 constitutes the maximum amount of restitution that the Court can order. (*Id.* at 5.)

The Government opposes Defendant's objection, arguing that Defendant's conduct related to Virginia Demolition and Whitaker Park appropriately falls within the scope of a restitution order in this matter. In support, the Government points to Fourth Circuit case law that adopts a broader view of victims and losses for purposes of criminal conduct involving schemes, such as wire fraud. (Reply at 3–8.) Citing *United States v. Lomas*, the Government points out that restitution must be paid to all victims harmed by the scheme at issue, even where Defendant is not convicted of each individual criminal act charged as part of, or comprising, the scheme. (*Id.* at 3 (citing 392 F. App'x. at 128–29).) The Government further highlights that losses need not result from the precise criminal conduct at issue, but can instead stem from conduct "closely related to the scheme." (*Id.* at 4–5 (citing *Karam*, 201 F.3d at 325–26).) Irrespective of that broadened lens, the Government argues that the actions involving Virginia Demolition and Whitaker Park do, in fact, constitute part of the same fraud scheme to which Defendant pled guilty, based on the charging documents in this case, and that any references to this conduct as "relevant conduct" for purposes of sentencing fails to alter that picture. (*Id.* at 5 n.1, 6.)

The dispute between Defendant and the Government centers on whether Defendant's misconduct beyond the Dickens-related conduct expressly outlined in the Information also qualifies as "criminal conduct" or conduct "closely related to the scheme" to which Defendant pled guilty. In this vein, the Court notes the somewhat unusual mechanism by which Defendant entered his guilty plea in this matter: rather than plead to one or more counts of a multi-count indictment (as occurred in the relevant cases reviewed by the Court), Defendant pled to a newly-

14

created, freestanding one-count Information. Given this uncommon posture, the Court errs on

the side of comprehensiveness, reviewing the statute and the case law concerning restitution

before analyzing the scope of Defendant's pled-to conduct and assessing whether that conduct

falls within the scope of activity for which restitution would be permissible here.

The relevant statutory provisions of the MVRA read as follows:

(a)(1)   Notwithstanding any other provision of law, when sentencing a defendant
         convicted of an [eligible] offense . . . the court shall order . . . that the
         defendant make restitution *to the victim of the offense* . . .

(2)      For the purposes of this section, the term "victim" means a person directly
         and proximately harmed as a result of the commission of an offense for
         which restitution may be ordered including, in the case of an offense that
         involves as an element a scheme, conspiracy, or pattern of criminal
         activity, any person directly harmed by the defendant's criminal conduct *in
         the course of the scheme, conspiracy, or pattern*. . .

18 U.S.C. § 3663A(a)(1), (2) (emphasis added).

The Fourth Circuit specifically addressed the MVRA's application to victims of wire

fraud schemes in *Lomas*, 392 F. App'x. at 122. There, the court underscored that, "[s]ince mail

fraud necessarily includes a *scheme* to defraud," the language in § 3663A(a)(2) defining the

universe of victims to such offenses as "all persons harmed by [the defendant] 'in the course of

[his participation in] the scheme'" necessarily applied to wire fraud cases. *Id.* at 127 (citing

§ 3663A(a)(2)) (emphasis in original). The *Lomas* court also reaffirmed previous Fourth Circuit

holdings involving wire fraud guilty pleas, holding that in such cases,

a sentencing court may order restitution for losses resulting from a scheme even if
the defendant is not convicted of each individual criminal act, e.g., indictment
count, as long as the acts are the direct result of the defendant's criminal conduct or
are "closely related to the scheme."

*Id.* at 128 (citing *Karam*, 201 F.3d at 326). On that basis, the court affirmed a restitution order

that provided funds to victims who were not directly harmed by the conduct to which the

defendant pled guilty, but whom the court found to have been "defrauded via mail fraud in the same manner as he attempted to defraud the individual identified" in the pled-to count, finding the losses sufficiently "closely related" to the scheme. *Id.* at 129.

In assessing whether restitution may be ordered with regard to losses beyond those related to the Dickens invoices, the Court must therefore assess whether two conditions precedent have been fulfilled: the additional losses (1) "result[ed] from a scheme" and (2) resulted from acts that were part of or "closely related to" the scheme. *Id.* at 128. Defendant does not contest the former. To assess whether the latter condition also stands satisfied here, the Court must establish the contours of the relevant scheme for purposes of this case before assessing whether the specific acts were, indeed, part of or closely related to that scheme. Given the unusual posture in this case, where Defendant pled guilty to a charging document separate from the Superseding Indictment, the Court analyzes both the Superseding Indictment and the Information to ascertain the "scheme" to which Defendant ultimately pled guilty.

As already discussed, the Superseding Indictment, which served as the operative charging document until Defendant decided to plead guilty, defined the primary purpose and object of Defendant's scheme as "to unjustly enrich himself by misappropriating loan proceeds intended for the development and construction of the Model Tobacco and Whitaker Park Projects." (Sup. Ind. ¶ 18.) It then outlined, as the manner and means of Defendant's scheme, a host of actions involving Defendant's alteration of invoices related to both Dickens Construction and Virginia Demolition, spanning both the Model Tobacco and Whitaker Park projects. (*Id.* ¶¶ 20–44.) The Information, in turn, describes the primary purpose of Defendant's scheme in similar (albeit more detailed) terms, defining its purpose as fourfold:

16

to: (1) generate falsified and inflated contractor invoices and lien waivers; (2) submit falsified and inflated invoices to CRBT and VHDA for loan disbursement; (3) enrich himself with inflated loan proceeds; and (4) conceal [his] falsification of invoices and lien waivers from CRBT and VHDA.

(Information ¶ 11.) As to the manner and means of that scheme, the Information lists only events involving inflated invoices related to Dickens Construction on the Model Tobacco project, omitting specific allegations related to Virginia Demolition and the Whitaker Park project. (*Id.* ¶¶ 13–23.) However, the Information specifies that the Dickens-related events comprised part, but not necessarily all, of the "various ways and means" through which Defendant "sought to accomplish" his fraudulent purposes. (*Id.* ¶ 12 (emphasizing that Defendant's "ways and means . . . *included*" the listed events. (emphasis added)).)

Defendant urges the Court to conclude that the Information reframes the scheme charged in the Superseding Indictment more narrowly for purposes of Defendant's conviction. In support, Defendant submits several points. First, Defendant points out that the Information "makes no mention of conduct regarding Virginia Demolition or the Whitaker Park project." (Resp. at 4.) Defendant also argues that the Superseding Indictment's allegations concerning Virginia Demolition are "significantly different in complexity and scope" from those contained in the Information, suggesting that the former allegations do not form part of the scheme alleged in the latter document. (*Id.*) Additionally, Defendant argues that the Dickens-related conduct described in the Information "had no relation to any activity in the Whitaker Park project." (*Id.*) Defendant points out that the Government's sentencing briefing referred to allegations surrounding Virginia Demolition as "relevant conduct," rather than offense conduct, arguing that such "relevant conduct" fails to qualify for restitution under Fourth Circuit law. (*Id.* at 4–5 (citing *United States v. Freeman*, 741 F.3d 426, 435 (4th Cir. 2014).) Critically, Defendant hinges his argument on the fact that "this is not a case where [Defendant] pled guilty to some

17

counts in a charging instrument alleging a broader scheme or pattern of conduct, that also included other counts to which he did not plead guilty." (Resp. at 4.) As such, the Court reads Defendant to assert that the Information — by existing separately from the Superseding Indictment — narrows the scheme underpinning Defendant's wire fraud conviction to solely the Dickens-related acts, rendering any losses related to Virginia Demolition and Whitaker Park beyond the permissible scope of a restitution order in this case.

Having considered the MVRA's text, the relevant case law addressing guilty pleas to charges involving schemes, the two charging instruments at issue and Defendant's arguments, the Court finds Defendant's objection to lack merit. The Court reaches this conclusion on two separate grounds. First, the Court finds that the scope of Defendant's wire fraud scheme remained unchanged from the Superseding Indictment to the Criminal Information,[5] and that therefore, the conduct for which the Government seeks restitution — all of which was specifically enumerated in the Superseding Indictment — constitutes conduct "in the course of the scheme." 18 U.S.C. 3663A(a)(2). The Court bases this finding on the significant overlap between the two charging documents and the broader context of the case. The Information's primary object-and-purpose language tracks that of the Superseding Indictment, with additional details as to who constituted the scheme's victims and the scheme's "how." (Information ¶ 11.) Critically, that "how" language covers the full spectrum of the manner and means enumerated in the Superseding Indictment, including Defendant's various invoice-related machinations

---

[5]    The only change that occurred between the Superseding Indictment and the Information concerns the specific criminal acts with which Defendant was charged (and to which he pled guilty). While these acts necessarily comprised part of the scheme, they do not comprise its entirety, as the Information makes clear. (*See* Information ¶ 12 (stating that the "various ways and means through which [Defendant] sought to accomplish the purpose of his scheme to defraud *included* the following.") (emphasis added).)

involving Virginia Demolition on both the Model Tobacco and Whitaker Park projects. Although the Information does not specifically reference Whitaker Park or Virginia Demolition, its expansive language — including its express statement that the manner and means merely "include" the Dickens-related conduct — fails to limit the scheme's scope. (*Id.* ¶¶ 11–12.) Read together, the charging documents also contain no indication that the Government intended to narrow the *scheme* in the Information, even if the *conduct* clearly differs. The procedural context of the case, in which the Information was prepared solely to facilitate a speedy resolution of this matter on a guilty plea, further confirms that the scheme underlying Defendant's conviction encompassed the full range of his actions.

Alternatively, even if the Court accepted Defendant's argument that the scheme as charged in the Information fails to include conduct involving Virginia Demolition and Whitaker Park, the losses resulting from that conduct would still qualify for restitution under the MVRA, because they indisputably constitute losses "closely related to the scheme." *Karam*, 201 F.3d at 326. As already discussed, the Information defines as the scheme's purpose Defendant enriching himself with inflated loan proceeds from CRBT by submitting falsified and inflated contractor invoices and lien waivers. (Information ¶ 11.) The Information specifies that the "various ways and means" that Defendant employed to accomplish this purpose "included" specific instances of such behavior tied to the Model Tobacco project. (*Id.* ¶¶ 12–23.) The close parallels between these specific instances and the Virginia Demolition and Whitaker Park-related conduct at issue here establish that the latter are sufficiently "closely related" to the former for MVRA purposes. The Virginia Demolition and Whitaker Park conduct closely parallels these charged instances. In both contexts, Defendant prepared falsified invoices and sought loan advances from the same victim (CRBT), using the same shell entity (Virginia Demolition), within the same four-month

period and in connection with the same or similar real estate development projects. (Sup. Ind. ¶¶ 20–30, 34–38.) The significant similarities in *modus operandi*, timeframe and the victims targeted compel a finding that this conduct stands "closely related" to the scheme charged in the Criminal Information, rendering any losses from such conduct within the scope of restitution under the MVRA. *See Karam*, 201 F.3d at 326 (affirming restitution for unconvicted conduct where the amount "represented losses that resulted from the same scheme to steal money from medical professionals by purporting to invest their money in fraudulent investment schemes"); *Lomas*, 392 F. App'x at 128–29 (upholding restitution order on the basis that the unconvicted conduct "defrauded [victims] via mail fraud in the same manner as [the defendant] attempted to defraud the individual identified in" the pled-to count).

Defendant's arguments to the contrary fail to carry the day. While the Court recognizes that Defendant's plea to a separate one-count information is formally different from a plea to one count of a multi-count indictment pursuant to a negotiated plea agreement, the Court finds no significance in this distinction for purposes of assessing the underlying scheme here, given the absence of indicia that the Information's filing comprised anything other than a negotiated means of resolving the charges in the underlying Superseding Indictment. Nor does the Government's characterization of Defendant's Virginia Demolition-related conduct as "relevant conduct" for sentencing purposes alter the analysis. The Court credits the Government's argument that this label fails to affect whether such conduct could also qualify as offense conduct — especially where, as here, that conduct constitutes charged offense conduct in the original charging document. (Reply at 5 n.1.)

Finally, the Court rejects Defendant's conclusory assertion that his fraudulent conduct relating to the Dickens invoices constituted "markedly different" behavior from his actions

involving Virginia Demolition and Whitaker Park. (Resp. at 9.) As already laid out, Defendant displayed a consistent *modus operandi* across the entirety of his misconduct: he falsified documents, used these documents to obtain more money from the bank than he was entitled to obtain, and then skimmed some of that money for his own gain. The minor distinctions between how Defendant executed the various instances of that *modus operandi* fail to alter the uniformity of that picture. That picture, in turn, plainly supports a finding that all of Defendant's relevant actions — not just those related to Dickens Construction — form part of the same scheme for purposes of restitution in this case. The Court rejects Defendant's contrary assertions on that basis.

For all of these reasons, the Court finds Defendant's objection to restitution on the grounds that the Government's proposed losses fall outside of the permissible statutory scope without merit and overrules it accordingly.

### B.    Forfeiture Objections

Defendant presents four objections to the Government's Motion as it concerns forfeiture. Two objections relate to the scope of the proposed forfeiture order and mirror Defendant's objections concerning restitution, while the other two concern the imposition of forfeiture in this case more broadly. The Court addresses each objection in turn.

### 1.    Lack of Improper Gains from Virginia Demolition

Defendant objects to forfeiture on the grounds that Defendant derived no improper gains whatsoever from actions involving his Virginia Demolition entity. As to his activities related to Whitaker Park, Defendant points out that CRBT was ultimately made whole as to its Whitaker Park-related loans and thus incurred no loss, while the other investors were fully aware that Defendant managed demolition services on that project through Virginia Demolition. (Resp. at

9.) Additionally, Defendant points to the fact that minority investor Andy Little represented that he did not consider himself to be a victim of any fraud and that the Government failed to account for Defendant's ownership stake in the Whitaker Park project of at least 33%, both of which support a level of illicit gains below that sought by the Government. (*Id.* at 9–10.) Regarding Defendant's actions related to the Model Tobacco project, Defendant presents the same three arguments that he raised concerning restitution for why the Government's illicit gain calculation is incorrect: (1) he poured $4.3 million of his own funds back into the project; (2) he held an 14.5% ownership interest in Model Tobacco, which the Government failed to adjust for; and (3) he provided services to the project through his Virginia Demolition entity, which the Government similarly failed to recognize. (*Id.* at 10–11.)

The Court rejects Defendant's arguments for largely the same reasons that it rejected Defendant's purportedly "legal" arguments concerning restitution. As explained in Section III.A.1, Defendant's challenges based on ownership interests and alleged credits for reinvestments or services are factual disputes about the Government's calculations, not legal arguments preserved by the parties' Stipulation, and therefore do not warrant revisiting the stipulated forfeiture amount. Nor has Defendant identified any legal authority for reducing forfeiture based on CRBT's lack of losses, other investors' awareness of his role, or an asserted reduction in the number of victims — considerations that bear on victims' (and non-victims') losses, rather than Defendant's gains. And finally, to the extent that Defendant argues that he realized "no improper gains" whatsoever through his Virginia Demolition entity, the Court already found otherwise. (*See* Sent. Hr'g Tr. 7:17–20 (finding that Defendant obtained illicit gains "via [] Virginia Demolition" in amounts exceeding $1.5 million).) Defendant provides the

Court with no new arguments that would justify disturbing this earlier finding as to his ill-gotten gains.

For all of these reasons, the Government rejects Defendant's objection to the Government's Motion on the basis that he purportedly realized no improper gains from Virginia Demolition.

### 2.    Scope of the Proposed Forfeiture Judgment

Defendant also objects to the Government's Motion, because it seeks forfeiture related to non-conviction conduct.  Defendant presents many of the same arguments that he raised in his similar objection to restitution, asserting that the pleaded-to misconduct involving Dickens Construction does not constitute the same scheme or offense as his activities involving Virginia Demolition, and that the latter are "markedly different" from and bear "little relation" to the conduct described in the Criminal Information.  (Resp. at 7, 9.)  Defendant also points out that the Information fails to expressly allege one all-encompassing scheme covering the entirety of Defendant's misconduct and never expressly mentions Virginia Demolition or Whitaker Park. (*Id.* at 8.)

The Court rejects Defendant's argument on largely the same grounds as his similar argument concerning restitution.  As explained below, because the non-conviction conduct underpinning the Government's Motion for forfeiture forms part of Defendant's fraudulent scheme as charged, and because gains from such conduct are susceptible to forfeiture under the relevant case law, Defendant's argument lacks merit.

Though the law surrounding forfeiture of ill-gotten gains from fraudulent schemes diverges slightly from that concerning restitution, the same basic principle governs with equal force:  gains (or losses) stemming from misconduct that comprises part of an underlying scheme

— even where a defendant is not expressly convicted of that misconduct — stand liable to seizure. Case law from this circuit and from sister circuits uniformly holds that, where substantive fraud offenses are charged as part of an ongoing scheme, the full amount of illicit proceeds *from that scheme* stand eligible for forfeiture, even where a court did not convict defendant of all acts comprising the scheme. *See, e.g., Budden*, 2012 WL 1315366 at *5 (finding that "the amount of the forfeiture should equal the full amount gained through the scheme to defraud alleged," even though Defendant pled guilty to only one count of the superseding indictment); *Cox*, 851 F.3d at 128–29 (agreeing with holdings of other circuits that when assessing forfeiture in "crimes that involve a scheme to defraud," courts should look to "the funds involved in that fraudulent scheme, including additional executions of the scheme that were not specifically charged"). While forfeiture may not extend to gains from conduct that is "closely related to," but not squarely part of, a fraudulent scheme, as in restitution, the case law leaves little doubt that forfeiture applies to gains derived from conduct within the scheme.

Here, the Court already found that the relevant "scheme" encompassed both the Dickens-related conduct in the Information and Defendant's Virginia Demolition and Whitaker Park-related actions set forth in the Superseding Indictment. *See supra* § III.A.2. Thus, under prevailing law, all gains from this conduct, including actions within the scheme for which Defendant was not convicted, stand eligible for forfeiture. *Budden*, 2012 WL 1315366 at *3. Defendant's arguments, which do not materially differ from those that the Court already considered in its analysis of the relevant scheme for restitution purposes, fail to persuade the Court that a different outcome is warranted here. The same stands true for Defendant's attempts to distinguish the case law. While Defendant correctly asserts that the forfeiture case law largely addresses the more conventional scenario where a defendant pleads guilty to one or more counts

of a multi-count indictment, rather than the instant situation of pleading guilty to a separate one-count criminal information, (Resp. at 8–9,) that distinction stands irrelevant where, as here, the overall scheme remains the same across both charging instruments. *See supra* § III.A.2. As such, and for all of the above reasons, the Court rejects Defendant's argument that the Government impermissibly included his Virginia Demolition and Whitaker Park-related conduct in its proposed forfeiture amount.

### 3.    Interference With Restitution

Defendant next objects to forfeiture on the grounds that such an order would interfere with his ability to pay restitution. Defendant points to 18 U.S.C. § 3572(b), titled "Imposition of a sentence of fine and related matters," which states that courts "shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b). While Defendant makes no specific assertions to this effect in his Response, he has previously represented to the Court that his liquid assets are largely depleted. (*See* Sent. Hr'g Tr. 16:20–21 ("I would just note that he's got nothing today.").) In addition, he represents that his equity stake in the Model Tobacco project (which he concedes "undeniably has value") may be reduced through the ongoing bankruptcy process, thus "further reducing his ability to make forfeiture and restitution payments." (Resp. at 11.) On this basis, Defendant asserts that a forfeiture order of $1.6 million "would significantly interfere with [Defendant's] ability to pay restitution" and objects to the order on that basis. (*Id.*) Defendant seeks to distinguish *United States v. Bennett*, where the Fourth Circuit recently rejected a similar challenge to a forfeiture order, arguing that in *Bennett*, the Government represented that it intended to "apply the forfeited assets to the restitution judgment," thus eliminating any potential negative impact of the forfeiture order on restitution. 986 F.3d 389,

25

398 (4th Cir. 2021). Defendant asserts (and the Government does not refute) that the Government has made no such representation in this case. (Resp. at 11–12.)

Defendant's argument runs headlong into Congress's express intent that, where authorized, forfeiture constitutes a mandatory part of a sentence. *See* 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court *shall order* the forfeiture of the property as part of the sentence.") (emphasis added); *Blackman*, 746 F.3d at 143 ("§ 2461 mandates that forfeiture be imposed when the relevant prerequisites are satisfied. . . "). In analyzing that congressional intent, the Fourth Circuit has emphasized that neither the imposition of a restitution judgment nor a defendant's lack of assets alters the mandatory nature of forfeiture. In *United States v. Blackman*, the Fourth Circuit reviewed this Court's imposition of a restitution judgment and its simultaneous refusal to enter a forfeiture order for the same amount. 746 F.3d at 140. While the district court did not initially explain its decision, the Fourth Circuit found that the court "appeared to base its denial of the [forfeiture] motion on the fact that [the defendant] lacked the assets necessary to satisfy" such a judgment. *Id.* at 142. In reversing the district court's decision, the Fourth Circuit found that the court's decision against imposing forfeiture stood "unsupported by any relevant legal authority." *Id.* at 145. The Fourth Circuit emphasized that "[f]orfeiture is mandatory even when restitution is also imposed," because they "serve distinct purposes," and that a defendant's inability to pay does not constitute a permissible consideration for forfeiture, since "conclud[ing] otherwise would enable wrongdoers to avoid forfeiture merely by spending their illegitimate gains prior to sentencing." *Id.* at 143–44. For all of these reasons, the court reversed the district court's decision and remanded with directions for entry of a forfeiture money judgment in addition to the already-imposed restitution judgment. *Id.* at 145.

The Court reads *Blackman* to require the imposition of a forfeiture judgment in this case, notwithstanding Defendant's concerns. The *Blackman* court could not have been clearer that, where, as here, the statutory prerequisites for forfeiture are met, a court lacks the discretion *not* to impose such an order. While Defendant cites 18 U.S.C. § 3572(b) and its language concerning the risk of a forfeiture order "impairing" a defendant's ability to pay restitution, *Blackman* expressly disavows consideration of restitution obligations or a defendant's inability to pay in the context of a forfeiture analysis. *Id.* at 143–44. The Court also notes the absence of any legal precedent invoking 18 U.S.C. § 3572(b) as a basis to curtail a forfeiture money judgment, as Defendant seeks in this case. In *United States v. Bennett*, the Fourth Circuit reviewed for plain error the district court's imposition of both forfeiture and restitution in light of § 3572(b). 986 F.3d at 398. The court rejected the appellant's argument against forfeiture on the basis of the Government's representation that it would apply forfeited assets to restitution, which, in the court's view, "would assist rather than impede the fulfillment of the restitution sentence." *Bennett*, 986 F.3d at 398. *Bennett* fails to support Defendant's argument here. Far from finding that § 3572(b) creates an exception to the mandatory imposition of forfeiture, the court merely found — based on facts different than Defendant's — that a forfeiture order *in that case* would not interfere with restitution. As such, *Bennett* fails to carve out an exception to *Blackman*'s clear mandate that forfeiture be imposed irrespective of concerns surrounding restitution, which constitutes binding precedent that this Court must follow. The Court therefore rejects Defendant's argument against forfeiture on § 3572(b) grounds.

### 4.    Objection on Eighth Amendment grounds

The Court turns to Defendant's final substantive objection to forfeiture, wherein he argues that a forfeiture judgment in the amount sought by the Government constitutes an

"excessive fine[]" prohibited by the Eighth Amendment. (Resp. at 12 (citing U.S. Const. amend. VIII).) Defendant argues that the proposed forfeiture amount of $1,631,424.19 stands "disproportionate to the gravity of [his] offense." (*Id.* at 13.) In support, he points to the mere $159,202.77 in gains that Defendant realized as a result of the Dickens-related misconduct, the fact that the harm caused by Defendant's scheme "did not affect the outcome of the project," Defendant's substantial investments in both projects, his contributions towards "getting the Model Tobacco project completed" during the COVID-19 pandemic, and the fact that his interest in the project may ultimately be "invalidated in bankruptcy court." (*Id.* at 12–13.)

The Government submits several arguments in opposition. First, it points out that the forfeiture amount requested "is less than the amount of illicit gain that the Court found," an amount that the Court determined after already factoring in Defendant's arguments concerning credits against losses. (Reply at 12.) The Government also points to what it characterizes as "wide ranging" criminal conduct, including "concealment and obstructive misconduct after pleading guilty," which in the Government's telling "caused devastating harms to victims." (*Id.* at 12–13.) On that basis, the Government asks the Court to overrule Defendant's objection on Eighth Amendment grounds. (*Id.* at 13.)

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In applying the Eighth Amendment to the forfeiture context, the Supreme Court held that "[f]orfeitures — payments in kind — are [] 'fines' if they constitute punishment for an offense" and thus stand subject to the limitations of the Eighth Amendment's Excessive Fines Clause. *United States v. Bajakajian*, 524 U.S. 321, 328 (1998). Under that clause, proportionality constitutes the "touchstone of the constitutional inquiry;" in other words, "[t]he amount of the

forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334; *see also Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (reiterating that the Excessive Fines Clause has its roots in the Magna Carta, which "required that economic sanctions be proportioned to the wrong and not be so large as to deprive an offender of his livelihood") (cleaned up). Forfeiture "grossly disproportional to the gravity of a defendant's offense" violates the Excessive Fines Clause. *Bajakajian*, 524 U.S. at 334. Courts in the Fourth Circuit weigh several factors when assessing whether a forfeiture request violates the Excessive Fines Clause, including (1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the charged crime and other crimes; and (4) the harm caused by the charged crime. *United States v. Jalaram, Inc.*, 599 F.3d 347, 355–56 (4th Cir. 2010). Given the high bar for establishing "gross disproportionality," the Fourth Circuit has recognized that defendants raising Eighth Amendment challenges to criminal forfeiture are generally unlikely to prevail on such challenges, particularly in cases involving a single offender. *Id.* at 354–55.

Having considered Defendant's arguments and weighed the relevant factors, the Court rejects Defendant's constitutional challenge and finds that the forfeiture sought by the Government fails to constitute a "grossly disproportionate" punishment. Defendant's argument for disproportionality fundamentally hinges on his assertion that the appropriate gain amount stands at only $159,202.77, which equals Defendant's gains from the Dickens-related portion of his scheme. (Resp. at 12.) As the Court already found, however, the relevant figure for purposes of forfeiture here includes the full amount of Defendant's illicit proceeds from the charged scheme, including conduct of which the defendant was not convicted. *See supra* § III.B.2; *Budden*, 2012 WL 1315366 at *5. The Court assessed this amount at $1,719,902.18. (Sent. Hr'g

Tr. 7:21.)  The Government's requested forfeiture amount of $1,631,424.19 thus sits nearly
$100,000 below the amount of Defendant's ill-gotten gains in this case.  On that basis alone, the
Court finds the proposed forfeiture in no way disproportionate to the offense, let alone "grossly"
so.  The remaining Fourth Circuit factors command the same result.  As the Court already found
at sentencing, Defendant perpetrated a "significant fraud" whereby "a lot of people lost a lot of
money," rendering his crime "severe."  (*Id.* 23:11–14.)  And as discussed above, the Superseding
Indictment outlines the many iterations and broad scope of Defendant's scheme.  While the
Court is unaware of additional illegal conduct by Defendant, this factor bears little weight on the
Court's calculus where the forfeiture amount already corresponds to the illicit gains obtained
through an extended scheme of illegal conduct.  Finally, the Court notes the Fourth Circuit's
observation that a finding of gross disproportionality will not apply to "most cases," particularly
those involving single defendants. *Jalaram*, 599 F.3d at 354–55.  Nothing before the Court
suggests that Defendant's case is the rare exception justifying a departure from that rule.

      For all of these reasons, the Court finds that the Government's proposed forfeiture
amount fails to constitute a "grossly disproportionate" punishment for Defendant's offense and
rejects Defendant's Eighth Amendment objection accordingly.

      **C.**    **Substitute Asset Order**

      Finally, Defendant objects to the Government's request that the Court should enter an
order pursuant to 21 U.S.C. § 853(p) concerning substitute assets for purposes of forfeiture.
Defendant argues that such a finding would be premature, "given the pending resolution of
[Defendant's] and other investors' interests in the Model Tobacco project" by the bankruptcy
court. (Resp. at 13.)  Defendant represents that his "proceeds" of $4.3 million were reinvested in
the Model Tobacco project.  (*Id.*)  As such, Defendant argues, these "proceeds" can be located,

30

have not been transferred or sold, have not substantially diminished in value and have not been commingled, thus warranting rejection of the Government's request. (*Id.*) The Government counters that Defendant "squandered the fraud proceeds on various luxury items and living expenses," and that Defendant himself represented to the Court that "any fraud proceeds he may have obtained appear to be long gone." (Reply at 13.) On that basis, the Government argues that a substitute assets finding under 21 U.S.C. § 853(p) would be appropriate. (*Id.*)

According to 21 U.S.C. § 853(p):

> if any property [subject to forfeiture] as a result of any act or omission of the defendant—(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty . . . the court shall order the forfeiture of any other property of the defendant, up to the value of any property [subject to forfeiture].

21 U.S.C. § 853(p)(1), (2). The Fourth Circuit has emphasized that § 853(p)'s language is "not discretionary; rather, the statute mandates forfeiture of substitute assets when the tainted property has been placed beyond the reach of a forfeiture." *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006) (internal quotation marks omitted). Section 853(p)(1)'s prerequisites are set forth in the disjunctive; where any one requirement is satisfied, "'the court shall order the forfeiture of *any other property of the defendant*, up to the value of' the property it substitutes." *United States v. Quincy*, 586 F. Supp. 3d 512, 516 (E.D. Va. 2022) (quoting 21 U.S.C. § 853(p)(2)) (emphasis in original). The Government must establish its entitlement to forfeiture of substitute property by a preponderance of the evidence. *United States v. Poulin*, 690 F. Supp. 2d 415, 421–22 (E.D. Va. 2010), *aff'd*, 461 F. App'x 272 (4th Cir. 2012).

The Court agrees with the Government and will grant the Government's request for substitute forfeiture. Even crediting Defendant's representation that he reinvested all of his illicit

gains in the Model Tobacco Project, that representation supports a finding that the funds in question here have been "transferred or . . . deposited with, a third party," i.e., Model Tobacco. 21 U.S.C. § 853(p)(1)(B). In investing these funds into what is now a bankrupt entity, the Court also finds that the funds have been "commingled with other property which cannot be divided without difficulty," particularly as bankruptcy proceedings remain ongoing. *Id.* § 853(p)(1)(E). The existence of bankruptcy proceedings further suggests that whatever funds were invested in Model Tobacco are now "substantially diminished in value." *Id.* § 853(p)(1)(D). For all of these reasons, the Court finds the criteria satisfied for a finding under 21 U.S.C. § 853(p)(1) concerning substitute assets for purposes of forfeiture.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT the Government's Motion (ECF No. 74). The Court will issue orders for restitution and forfeiture in the amounts stipulated by the parties. The Court also finds that the requirements of 21 U.S.C. § 853(p) have been satisfied.

Appropriate orders shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Alexandria, Virginia
Dated: December 22, 2025

32